WYNN, Circuit Judge, concurring:
I concur fully in the majority opinion's analysis and conclusion that the Proclamation's indefinite suspension of entry of nationals from eight countries, six of which are predominantly Muslim, likely violates the Establishment Clause. I also concur fully in the majority opinion's conclusion that Plaintiffs have standing to assert their constitutional claim, that Plaintiffs' constitutional claim is justiciable, and that the balance of equities supports enjoining the *322 Proclamation's indefinite suspension on entry. And I further concur in Chief Judge Gregory's and Judge Keenan's determinations that Plaintiffs have standing to raise their statutory claims and that those claims are otherwise justiciable. I write separately because I do not believe that resolving this case on constitutional grounds alone adequately serves all of the interests we must vindicate. In particular, the Proclamation's indefinite suspension on entry-which the majority correctly determines was "driven by anti-Muslim bias," ante at 264-exceeds the authority Congress delegated to the President in the Immigration and Nationality Act (the "Immigration Act"), 8 U.S.C. § 1101 et seq. , because it denies entry to a class of aliens based on invidious discrimination.[1]
Neither the dissenting opinion nor the Government has taken the position that the Immigration Act-or the Constitution, for that matter-permits the President to deny entry to a class of individuals defined by their race, sex, national origin, or religion solely on the basis of animus against that race, sex, nationality, or religion. On the contrary, during oral argument, the Government conceded that a presidential proclamation banning entry of aliens on the basis of invidious discrimination would exceed the President's authority under the Immigration Act and the Constitution. Oral Arg. Rec. 11:35-12:20 (conceding that the President lacks authority under the Immigration Act to ban men from entering the United States because "under constitutional law you can't use forbidden traits as a proxy, you have to target the actual conduct that you are worried about").
And the President never has disputed that his Proclamation banning entry of nationals of predominantly Muslim countries implements his campaign promise to ban Muslims from entering the United States. Again to the contrary, notwithstanding numerous efforts by his subordinates and attorneys to characterize the Proclamation as responding to legitimate national security risks posed by terrorists and countries that fail to maintain or share adequate information regarding their nationals, the President and his advisors repeatedly and consistently represented to the public that the Proclamation relies on national origin as a proxy for discriminating based on anti-Muslim animus. E.g. , J.A. 135, 168, 779, 791, 808-10, 815-20, 1497-1500, 1502-03. Indeed, the President repeatedly distanced himself from the non-discriminatory policy rationales of his subordinates upon which the Proclamation and the Government relies. J.A. 791, 832. Accordingly, this Court must decide *323 whether to accept the President 's consistent characterization of his Proclamation as intended to invidiously discriminate against Muslims-and therefore hold that the Proclamation violates the law-or reject or ignore the President 's explanation of his Proclamation -and therefore uphold the Proclamation.
As my colleagues' opinions recognize, resolving that question implicates difficult questions regarding the carefully constructed constitutional allocation of powers within and among the three coordinate branches-and the degree of judicial deference that allocation of powers contemplates-as well as the judiciary's long-recognized obligation to give effect to the individual and collective rights set forth in the Constitution. Any decision the judiciary renders on the lawfulness of the President's Proclamation necessarily will display some lack of deference to the executive branch: If we uphold the Proclamation, as the dissent would have us do, we will be refusing to respect the President's own stated purpose in promulgating the Proclamation and his position as the unitary head of the executive branch , in favor of policy conclusions reached by his unelected subordinates-policy rationales with which the President has repeatedly expressed disagreement. By contrast, if we strike down the Proclamation, we will be refusing to give effect to the considered judgment of those subordinates-who are better positioned to address questions of national security than the judiciary-that the Proclamation advances legitimate, non-discriminatory interests.
Additionally, any decision the judiciary renders will implicate the due respect we must show to Congress. In particular, if we accept the President's repeated characterizations of his Proclamation as serving his goal of banning Muslims and simultaneously conclude that the Proclamation complies with the Immigration Act, we would necessarily conclude that Congress authorized the President to engage in invidious discrimination on the basis of race, sex, national origin, or religion. Likewise, if we accept the Government's argument that the Immigration Act confers on the President unfettered discretion to deny entry to any class of aliens-including classes defined solely on the basis of race, sex, national origin, or religion-then we would necessarily conclude that the President can nullify Congress's "finely reticulated regulatory scheme governing the admission of foreign nationals." Hawai'i v. Trump , 878 F.3d 662, 685 (9th Cir. 2017), cert granted --- U.S. ----, 138 S.Ct. 923, --- L.Ed.2d ----, 2018 WL 324357 (Jan. 19, 2018). But as a matter of deference to Congress, the Supreme Court has admonished lowered courts not to presume, absent clear evidence, that Congress delegated to the executive branch the authority to trench on constitutional rights, see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council , 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), and not to presume that Congress authorized the executive branch to entirely upend Congress's carefully crafted statutory schemes, see Costello v. Immigration & Naturalization Serv. , 376 U.S. 120, 126, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964).
Given that this case raises fundamental questions regarding allocation of powers, judicial deference, and individual and collective rights-and because, as Judge Harris wisely notes, any constraints our opinion imposes "will operate against future Presidents under future circumstances as yet unknown," post at 352-I believe we must decide this case narrowly, in a manner that protects the core constitutional rights at stake without unduly intruding on the deference we owe to our coordinate branches. Judge Harris's opinion concludes *324 that because Plaintiffs' Establishment Clause challenge turns on "a series of facts that is highly unusual and unlikely to recur," deciding this case solely on constitutional grounds "will prove to be a precedent of exceedingly limited application." Id. at 352, 353. I share Judge Harris's hope that the judiciary will not again be forced to confront a presidential action "inexplicable by anything but animus towards the class it affects." Romer v. Evans , 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).
But, as stated earlier, I do not believe that resolving this case on constitutional grounds alone adequately serves all of the interests we must vindicate. In particular, if we conclude that the Proclamation's indefinite ban on entry violates the Establishment Clause without addressing Plaintiffs' claim that the ban exceeds the President's authority under the Immigration Act, we will leave the impression that Congress may have authorized the President to encroach on deeply engrained constitutional rights by invidiously discriminating against a disfavored religious group-precisely what the due respect we must show to Congress's constitutional judgment forbids. Because (1) imposing burdens on individuals solely on the basis of their race, sex, national origin, or religion is "odious to a free people whose institutions are founded upon the doctrine of equality," Hirabayashi v. United States , 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), and because (2) the Immigration Act provides no indication that Congress intended to empower the President to engage in such invidious discrimination, I believe this Court should resolve Plaintiffs' statutory claims as well, and thereby eliminate any doubt as to Congress's lack of complicity in the President's discriminatory action. To the extent Congress in fact wishes to authorize the President to deny entry based on invidious discrimination, it may enact legislation explicitly providing such authority-and the judiciary can address the constitutionality of such legislation at that juncture. But absent such legislation, I believe it would be improper to create any ambiguity as to whether Congress endorsed the President's invidious discrimination.
As I explained in concluding that the previous iteration of the President's travel ban exceeded the President's authority under the Immigration Act, the statutory provision upon which the Government principally relies, 8 U.S.C. § 1182(f), provides no indication that Congress intended for the "broad generalized" delegation of authority to deny entry to classes of aliens to allow the President "to trench ... heavily on [fundamental] rights." Kent v. Dulles , 357 U.S. 116, 129-30, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). And even if the plain language of Section 1182(f) suggested Congress had given the President such unfettered discretion to invidiously discriminate-which it does not-a statute delegating to the President the authority to engage in discrimination "for its own sake" would raise grave constitutional concerns. Romer , 517 U.S. at 635, 116 S.Ct. 1620. That is why-even when faced with a congressional delegation of seemingly unbridled power to the President or his appointees-the Supreme Court repeatedly "ha[s] read significant limitations into ... immigration statutes in order to avoid their constitutional invalidation." Zadvydas v. Davis , 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).
Accordingly, in addition to agreeing with the majority's conclusion that the Proclamation's indefinite ban on entry violates the Establishment Clause, I also conclude that the ban exceeds the President's authority under the Immigration Act, which *325 nowhere authorizes the President to deny entry based on invidious discrimination against members of a particular race, sex, nationality, or religion. Significantly, my conclusion that the Immigration Act does not authorize the President to engage in invidious discrimination in denying entry to classes of aliens constitutes a minimal constraint on the broad discretion Congress afforded to this President and future executives to control our borders by denying entry to classes of aliens that are detrimental to national interests. Rather, it simply requires that the President exercise that discretion in accordance with foundational constitutional principles-a conclusion with which the Government agrees. See Oral Arg. Rec. 11:35-12:20. Put differently, the constraint imposed by my construction of the Immigration Act is no greater than that imposed by the Constitution.
I.
The Government principally has argued, both on appeal and before the district court, that the suspension on entry falls within the President's delegated power under 8 U.S.C. § 1182(f).[2] That statute provides, in relevant part, that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." § 1182(f).
The majority opinion finds, and I agree, that Plaintiffs are likely to establish-based on statements by the President and his advisors-that in promulgating the Proclamation's indefinite ban on entry, the President relied on one suspect classification (national origin) as a proxy to purposely discriminate against members of another suspect class (adherents to a particular religion) solely on the basis of their membership in that class. Ante at 266-68. Thus, in considering Plaintiffs' statutory claim, we confront the following question: Did Congress, in enacting Section 1182(f), authorize the President to deny entry to a class of aliens on the basis of invidious discrimination?
A.
Two related canons of statutory construction bear directly on this question. First, under the "constitutional avoidance canon," "when an Act of Congress raises 'a serious doubt' as to its constitutionality, '[courts must] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " Zadvydas , 533 U.S. at 689, 121 S.Ct. 2491 (quoting Crowell v. Benson , 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ). "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation *326 of the statute is 'fairly possible' [courts] are obligated to construe the statute to avoid such problems." I.N.S. v. St. Cyr , 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citation omitted) (quoting Crowell , 285 U.S. at 62, 52 S.Ct. 285 ). This canon "rest[s] on the reasonable presumption that Congress did not intend [an interpretation] which raises serious constitutional doubts." Clark v. Martinez , 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). Put differently, "[t]he courts will ... not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." DeBartolo Corp. , 485 U.S. at 575, 108 S.Ct. 1392.
The Supreme Court has applied the constitutional avoidance canon on several occasions to narrow facially broad statutes relating to immigration and national security. For example, in Zadvydas v. Davis , 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court assessed whether Section 1231(a)(6) of the Immigration Act-which provides that certain categories of aliens who have been ordered removed "may be detained beyond the removal period"-authorized the detention of such categories of aliens indefinitely. 533 U.S. at 689, 121 S.Ct. 2491. Notwithstanding that Section 1231(a)(6) placed no express limitation on the duration of such detentions, the Supreme Court "read an implicit limitation into the statute ... limit[ing] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." Id. Explaining that "permitting indefinite detention of an alien would raise a serious constitutional problem" and noting the absence of "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed," the Supreme Court concluded that the constitutional avoidance canon required adoption of the "implicit limitation." Id. at 690, 697, 121 S.Ct. 2491.
The Supreme Court also relied on the constitutional avoidance canon in I.N.S. v. St. Cyr , 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In that case, the Supreme Court rejected the Government's arguments that two statutes amending the Immigration Act (1) deprived the judiciary of jurisdiction to review habeas corpus petitions filed by certain aliens subject to removal orders and (2) retroactively deprived certain aliens who had pled guilty to criminal offenses-which convictions rendered such aliens removable-the opportunity to pursue a discretionary waiver of removal, notwithstanding that such aliens had been entitled to pursue such a waiver at the time of their plea. Id. at 292-93, 297, 121 S.Ct. 2271. In reaching these conclusions, the Supreme Court acknowledged that Congress, at least in certain circumstances, has the constitutional authority to repeal habeas jurisdiction and to make legislation retroactive. Id. at 298-99, 315-16, 121 S.Ct. 2271. Nonetheless, because (1) the Government's proposed constructions would have required the Supreme Court to hold that Congress intended to exercise "the outer limits of [its] power" under the Constitution and (2) the legislation included no "clear, unambiguous, and express statement of congressional intent" indicating that Congress intended to exercise the "outer limits" of its power, the Supreme Court rejected the Government's positions. Id. at 299, 313-26, 121 S.Ct. 2271.
The second applicable canon of construction-which is a corollary to the constitutional avoidance canon-requires an even clearer indication of congressional intent regarding the infringement on constitutional rights due to the absence of direct action by Congress. That canon forbids courts from construing a "broad generalized"
*327 delegation of authority by Congress to the executive as allowing the executive to exercise that delegated authority in a matter that "trench[es]" upon fundamental rights, Kent , 357 U.S. at 129, 78 S.Ct. 1113, absent an "explicit" statutory statement providing the executive with such authority, Greene v. McElroy , 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ; see also Cass R. Sunstein, Nondelegation Canons , 67 U. Chi. L. Rev. 315, 316 (2000) ("Administrative agencies are not permitted to construe federal statutes in such a way as to raise serious constitutional questions; if the constitutional question is substantial, Congress must clearly assert its desire to venture in the disputed terrain.").
Under this canon, which I will refer to as the "nondelegation canon of constitutional avoidance," courts must "construe narrowly all delegated powers that curtail or dilute" fundamental rights. Kent , 357 U.S. at 129, 78 S.Ct. 1113 ; see also United States v. Robel , 389 U.S. 258, 275, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring) ("The area of permissible indefiniteness [in a delegation] narrows, however, when the regulation ... potentially affects fundamental rights.... This is because the numerous deficiencies connected with vague legislative directives ... are far more serious when liberty and the exercise of fundamental rights are at stake."). The Supreme Court requires that delegations that potentially authorize the executive to encroach on fundamental rights "be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." Greene , 360 U.S. at 507, 79 S.Ct. 1400 (emphasis added) (citation omitted).
As with the constitutional avoidance canon, the Supreme Court has applied the nondelegation canon of constitutional avoidance to statutes involving immigration and national security. For example, in United States v. Witkovich , 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957), the Supreme Court interpreted Section 242(d)(3) of the Immigration and Nationality Act of 1952, which provided that the Attorney General could require any alien subject to a final order of deportation that had been outstanding for more than six months "to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper." 353 U.S. at 195, 77 S.Ct. 779 (quoting 8 U.S.C. § 1252(d)(3) (1952) ). The Government asserted that the plain language of the provision afforded the Attorney General near unfettered discretion to demand information from such aliens. Id. at 198, 77 S.Ct. 779. Although the Supreme Court acknowledged that "[t]he language of [Section] 242(d)(3), if read in isolation and literally, appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of [such] aliens," the Supreme Court limited the Attorney General's authority under Section 242(d)(3) to "questions reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue." Id. at 199, 202, 77 S.Ct. 779. In rendering this narrowing construction, the Supreme Court emphasized, first, that the broad reading proposed by the Government would call into question the statute's constitutional validity and, second, that the context and legislative history did not provide unambiguous evidence that Congress intended to give the Attorney General the unbridled authority the Government *328 claimed. Id. at 199-200, 77 S.Ct. 779.
The Supreme Court also applied the nondelegation canon of constitutional avoidance in Kent v. Dulles , 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). There, the Supreme Court was asked to construe a statute providing that "[t]he Secretary of State may grant and issue passports ... under such rules as the President shall designate and prescribe for and on behalf of the United States." 357 U.S. at 123, 78 S.Ct. 1113 (internal quotation marks omitted) (quoting 22 U.S.C. § 211a (1952) ). Pursuant to that authority, the executive branch promulgated a regulation authorizing the Secretary of State to demand an affidavit from any passport applicant averring whether the applicant had ever been a Communist and barring issuance of passports to Communists. Id. at 118 & n.2, 78 S.Ct. 1113. Under that regulation, the Department of State denied a passport to an applicant on grounds he refused to submit such an affidavit. Id. at 118-19, 78 S.Ct. 1113. Thereafter, the applicant sought a declaratory judgment that the regulation was unconstitutional. Id. at 119, 78 S.Ct. 1113. Despite the breadth of the plain language of the delegating statute, the Supreme Court "hesitate[d] to impute to Congress ... a purpose to give [the Secretary of State] unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." Id. at 128, 78 S.Ct. 1113. Emphasizing (1) that the authority to deny a passport necessarily involved the power to infringe on the fundamental right to travel and (2) that the statutory delegation provision's "broad generalized" terms were devoid of any "explicit" indication Congress had intended to "give[ ] the Secretary authority to withhold passports to citizens because of their beliefs or associations," the Supreme Court refused "to find in this broad generalized power an authority to trench so heavily on the rights of the citizen." Id. at 129-30, 78 S.Ct. 1113.
Taken together, the two canons reflect the basic principle that "when a particular interpretation of a statute invokes the outer limits of Congress's power, we expect a clear indication that Congress intended that result." St. Cyr , 533 U.S. at 299, 121 S.Ct. 2271 ; see also United States ex rel. Knauff v. Shaughnessy , 338 U.S. 537, 548, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (Frankfurter, J., dissenting) (explaining that legislation potentially encroaching on fundamental rights "should not be read in such a decimating spirit unless the letter of Congress is inexorable"). Although closely related, the two canons are analytically distinct. In particular, the constitutional avoidance canon involves direct actions by Congress that potentially encroach upon fundamental rights. By contrast, the nondelegation canon of constitutional avoidance governs delegations by Congress that potentially allow a delegatee to exercise congressional power to encroach on fundamental rights. Because Congress does not itself decide when or how its delegated authority will be exercised, any encroachment on individual rights by Congress's delegatee must be supported by an "explicit" statement that Congress intended to permit such encroachment, Greene , 360 U.S. at 507, 79 S.Ct. 1400 -a more stringent requirement than the "clear indication" necessary when Congress acts directly, Zadvydas , 533 U.S. at 696-97, 121 S.Ct. 2491.[3]
*329 B.
The constitutional avoidance canon and the nondelegation canon of constitutional avoidance bear directly on the scope of authority conferred on the President by Congress under Section 1182(f) because, if construed broadly, Section 1182(f) could authorize the President to infringe on fundamental constitutional rights. In particular, the Supreme Court has "consistently repudiated '(d)istinctions between citizens solely because of their ancestry' [or race] as being 'odious to a free people whose institutions are founded upon the doctrine of equality.' " Loving v. Virginia , 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (quoting Hirabayashi v. United States , 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) ). "[T]he imposition of special disabilities" upon a group of individuals based on "immutable characteristic[s] determined solely by the accident of birth," like race and national origin, runs contrary to fundamental constitutional values enshrined in the Fifth and Fourteenth Amendments because it "violate[s] 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility.' " See Frontiero v. Richardson , 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion) (quoting Weber v. Aetna Cas. & Sur. Co. , 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) ). Accordingly, the Constitution forbids "[p]referring members of any one group for no reason other than race or ethnic origin." Regents of Univ. of Cal. v. Bakke , 438 U.S. 265, 307, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., concurring in judgment). Or, more simply, the Constitution prohibits "discrimination for its own sake." Id.
Although religion, unlike race and national origin, is not an immutable characteristic, the Constitution treats classifications drawn on religious grounds as equally offensive. The First Amendment "mandates governmental neutrality between religion and religion, and between religion and nonreligion." McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky. , 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quoting *330 Epperson v. Arkansas , 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ). To that end, the Constitution forbids both discriminating against "those who embrace[ ] one religious faith rather than another" and "preferring some religions over others-an invidious discrimination that would run afoul of the [Constitution]." United States v. Seeger , 380 U.S. 163, 188, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (Douglas, J., concurring).
If Congress delegated to the President the authority to deny entry to an alien or group of aliens based on invidious discrimination against a race, sex, nationality, or religion, then Section 1182(f) would encroach on the core constitutional values set forth in the First, Fifth, and Fourteenth Amendments: The President could deny entry to aliens of a particular race solely based on the color of their skin. The President could deny entry to a class of aliens solely based on their sex. The President could deny entry to nationals of a particular country solely on the basis of their place of birth. The President could deny entry to adherents of a particular religion solely because of their subscription to that faith. Or, as this Court concludes the President did here, the President could rely on one form of invidious discrimination-discrimination based on national origin-to serve as pretext for implementing another form of invidious discrimination-discrimination based on religion.
The President justified his use of this layered invidious discrimination on grounds that nationals of the predominantly Muslim countries subject to the ban on entry pose a special risk to United States security. Proclamation, Preamble . In particular, the Proclamation states that most, but not all, of the countries subject to the suspension on entry failed to meet "baseline" criteria specified by the Department of Homeland Security regarding the maintenance and sharing identity and national security information regarding their nationals. Id. §§ 1, 2. The countries subject to the indefinite suspension on entry constitute slightly less than half of the countries the Department of Homeland Security designated as failing to maintain or share "adequate" identity and national security information.
The Proclamation further states that the predominantly Muslim countries subject to the suspension on entry "also have a significant terrorist presence within their territory." Id. , Preamble . Accordingly, with regard to his concerns about terrorism, the President relies on the acts of specific individuals and groups of individuals (i.e. , "terrorists" and "terrorist groups") within the countries-individuals who are not necessarily even nationals of those countries-to establish that all nationals of those countries pose a danger to the United States. Dissenting from the Supreme Court's sanctioning of the forced internment of Japanese Americans during World War II, Justice Murphy explained the danger such rationales pose to the core constitutional value of equality:
[T]o infer that examples of individual [misconduct] prove group [misconduct] and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights. Moreover, this inference ... has been used in support of the abhorrent and despicable treatment of minority groups by the dictatorial tyrannies which this nation is now pledged to destroy. To give constitutional sanction to that inference ... is to adopt one of the cruelest of the rationales used by our enemies to destroy the dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow.
*331 Korematsu v. United States , 323 U.S. 214, 240, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (Murphy, J., dissenting).
To be sure, the Supreme Court has recognized that, particularly in times of war,[4] Congress has broad authority to control immigration, including the power to authorize the President to establish policies restricting the entry of aliens. See Landon v. Plasencia , 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (stating that "the power to admit or exclude aliens is a sovereign prerogative" entrusted almost exclusively to Congress). And "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.' " Fiallo v. Bell , 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting Mathews v. Diaz , 426 U.S. 67, 80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ).
But the Supreme Court also has long, and repeatedly, held that Congress's power to create immigration laws remains "subject to important constitutional limitations." Zadvydas , 533 U.S. at 695, 121 S.Ct. 2491 ; see also, e.g. , I.N.S. v. Chadha , 462 U.S. 919, 940-41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power."); Chae Chan Ping v. United States , 130 U.S. 581, 604, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (holding that Congress's constitutionally devised powers to control immigration, among other powers, are "restricted in their exercise only by the constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). That is particularly true when the discriminatory burdens of an immigration policy fall not just on aliens who have no claim to constitutional rights, but also on citizens and other individuals entitled to constitutional protections. Cf. Zadvydas , 533 U.S. at 693-94, 121 S.Ct. 2491 (surveying the Supreme *332 Court's immigration jurisprudence and finding that whether a plaintiff alien could lay claim to constitutional protections "made all the difference").
Here, aliens who are denied entry by virtue of the President's exercise of his authority under Section 1182(f) can claim few, if any, rights under the Constitution. But when the President exercises that authority based solely on animus against a particular race, sex, nationality, or religion, there is a grave risk-indeed, likelihood-that the constitutional harm will redound to individuals who can claim constitutional rights. Cf. Kleindienst v. Mandel , 408 U.S. 753, 764-65, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (recognizing that governmental decision barring entry of alien allegedly on the basis of his political beliefs implicated First Amendment rights of citizens to personally engage with those beliefs). For example, we hold today that the denial of entry to a class of aliens solely based on their adherence to a particular religion violates the Establishment Clause rights of Plaintiffs, who are citizens or lawful permanent residents, by constituting state-sanctioned discrimination against adherents of a disfavored religion. Ante at 269-70. Likewise, were the President to deny entry to a class of aliens solely based on their race, residents of that race would be subjected to a constitutionally cognizable "feeling of inferiority as to their status in the community." Brown v. Bd. of Educ. of Topeka , 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954). And denying entry to classes of aliens based on invidious discrimination has the potential to burden the fundamental right of residents to marry the partner of their choice based on nothing more than the partner's race, sex, nationality, or religion.[5] Loving , 388 U.S. at 12, 87 S.Ct. 1817 ("There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause."). Put simply, when the Government engages in invidious discrimination-be it against aliens or residents-individuals whose rights the Constitution protects face substantial harm.
Because construing the Immigration Act as authorizing the President to engage in invidious discrimination is plainly inconsistent with basic constitutional values and because the violation of those values implicates the rights of citizens and lawful permanent residents, not just aliens, the Government's proposed construction "raise[s] serious constitutional problems." St. Cyr , 533 U.S. at 299-300, 121 S.Ct. 2271.
C.
Having concluded that the Government's broad construction of the Immigration Act raises serious constitutional concerns, we must reject that construction absent a "clear indication of congressional intent" to allow the President to deny the entry of classes of aliens on invidiously discriminatory bases. Zadvydas , 533 U.S. at 696-97, 121 S.Ct. 2491. And because the Immigration Act involves a delegation of congressional authority, not a direct action by Congress, the indication of congressional intent to authorize the President, as delegatee, to encroach on fundamental rights must be "explicit." Greene , 360 U.S. at 507, 79 S.Ct. 1400.
*333 To ascertain congressional intent, we look to the "plain meaning" of Section 1182(f). Ross v. R.A. North Dev., Inc. (In re Total Realty Mgmt.) , 706 F.3d 245, 251 (4th Cir. 2013). "To determine a statute's plain meaning, we not only look to the language itself but also the specific context in which that language is used, and the broader context of the statute as a whole." Id. (internal quotation marks omitted); see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc. , 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (holding that in ascertaining congressional intent, courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy" (internal quotation marks omitted) ). Here, neither the language of Section 1182(f) or any other provision in the Immigration Act, nor the context in which the language is used, nor the "object and policy" underlying the Immigration Act "explicitly" state, much less "clear[ly] indicat[e]," that Congress intended to authorize the President to deny entry to aliens based on invidious discrimination.
1.
Beginning with the plain language, Section 1182(f) permits the President to suspend the entry of "any aliens or of any class of aliens" only when he "finds that the entry of [such aliens] would be detrimental to the interests of the United States." Accordingly, the plain language of Section 1182(f) does not explicitly authorize the President to deny entry to a class of aliens solely defined by religion or by race, sex, national origin, or other immutable characteristic.
Nonetheless, in arguing that Section 1182(f) authorizes the Proclamation's suspension on entry, the Government focuses on that statute's use of the term "any class of aliens." Appellants' Br. at 29. But the Government's argument omits the crucial limitation Congress imposed by requiring that the President may bar entry only upon a finding that entry of a class of aliens "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). That restriction requires a substantive connection between an alien's membership in a particular class and the likelihood that the alien's entry would be detrimental to the interests of the United States.
Detrimental is defined as "harmful" or "damaging." Webster's Third New International Dictionary (2002). Accordingly, Section 1182(f) authorizes the President to deny entry to an alien if the President has reason to believe that, by virtue of the alien being a member of a particular class, the alien's entry is more likely to damage or harm the interests of the United States. But the Constitution forbids imposing legal burdens on a class of individuals solely based on race or national origin precisely because those immutable characteristics bear no "relationship to individual responsibility." Weber , 406 U.S. at 175, 92 S.Ct. 1400. As the Government concedes, because an alien's race, sex, or nationality bears no "relationship to individual responsibility," those characteristics, by themselves, cannot render it more likely that the alien's entry will damage or harm the interests of the United States. Oral Arg. Rec. 11:35-12:20; cf. Romer , 517 U.S. at 632, 636, 116 S.Ct. 1620 (holding that "a classification of persons undertaken for its own sake" is "inexplicable by anything but animus towards the class it affects[, has no] relationship to legitimate state interests," and therefore violates the Fourteenth Amendment). Likewise, the Constitution's prohibition on discriminating against "those who embrace[ ] one religious faith rather than another,"
*334 Seeger , 380 U.S. at 188, 85 S.Ct. 850 (Douglas, J., concurring), means that an alien's adherence to a particular religion alone also provides no constitutionally cognizable basis for concluding that the alien's entry is disproportionately likely to harm or damage the interests of the United States.
Because race, sex, national origin, and religion bear no factual or constitutionally cognizable relationship to individual responsibility, courts have long interpreted delegation provisions in the Immigration Act as barring executive officials from engaging in invidious discrimination. For example, in United States ex rel. Kaloudis v. Shaughnessy , 180 F.2d 489 (2d Cir. 1950) (Hand, J.), the Second Circuit recognized "implied limitations" on Congress's facially broad delegation of authority to the Attorney General to suspend the deportation of any alien unlawfully present in the country. 180 F.2d at 490. Writing for the court, Judge Hand suggested that denying suspension of deportation based on "irrelevant" reasons having no bearing on whether the "alien's continued residence [was] prejudicial to the public weal"-such as "becom[ing] too addicted to attending baseball games, or ha[ving] bad table manners"-would exceed the Attorney General's congressionally delegated authority. Id. Factors like these, Judge Hand explained, are "considerations that Congress could not have intended to make relevant " to a determination of whether an alien could permissibly remain in the United States.[6] Id. at 491 (emphasis added). Under the dictates of equality established by the Constitution, an alien's race, sex, nationality, or religion is as irrelevant to the potential for his entry to harm the interests of the United States as is the alien's addiction to baseball or his poor table manners.
Judge Friendly made this point clear in Wong Wing Hang v. I.N.S. , 360 F.2d 715 (2d Cir. 1966) (Friendly, J.). There, the Second Circuit again confronted a question regarding the scope of the Attorney General's authority-delegated by Congress-to suspend an alien's deportation. 360 F.2d at 716-17. Judge Friendly concluded that "the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group ." Id. at 719 (emphasis added). Like addiction to baseball and poor table manners, invidious discrimination is a "consideration[ ] that Congress could not have intended to make relevant" to decisions regarding whether to allow an alien residence in the United States, Judge Friendly held. Id. (internal quotation marks omitted) (quoting Kaloudis , 180 F.2d at 491 ).
Just as Congress "could not have intended to make" considerations like "invidious discrimination against a particular race or group" relevant to the Attorney General's discretionary decision to suspend an alien's deportation from the United States, id. , Congress "could not have intended to make" invidious discrimination relevant to the President's discretionary determination regarding whether the entry of a particular alien or class of aliens is "detrimental to the interests of the United States," 8 U.S.C. § 1182(f). That is because invidious discrimination has no connection to whether an alien's presence in the United States *335 would be harmful or damaging to the nation or its interests. Accordingly, not only does the plain language of Section 1182(f) fail to "explicitly" authorize the President to use invidious discrimination in determining whether to deny entry to a class of aliens, see Greene , 360 U.S. at 507, 79 S.Ct. 1400, it does not even provide a "clear indication" that Congress intended to delegate to the President the power to invidiously discriminate, see Zadvydas , 533 U.S. at 696-97, 121 S.Ct. 2491.
2.
Nor does the broader context of the Immigration Act, and Section 1182(f) 's place within it, suggest that Congress intended Section 1182(f) to allow the President to suspend the entry of a class of aliens based on invidious discrimination. In Section 1182(a), Congress enumerates numerous specific classes of aliens who are ineligible for visas or admission. These categories encompass, for example, classes of individuals who pose a variety of health, safety, and security risks, or are likely to become public charges. See generally 8 U.S.C. § 1182(a). Many of the categories are quite specific, providing particularized reasons why individual aliens may be deemed inadmissible. For example, aliens who have been convicted of certain crimes, served as foreign government officials and committed "particularly severe violations of religious freedom," or participated in the commission of torture are inadmissible. 8 U.S.C. § 1182(a)(2)(A), (G) ; id. § 1182(a)(3)(E)(iii). Likewise, Section 1182(a) deems inadmissible aliens who have been members of a totalitarian or Communist party, abused their status as student visa holders, or "engaged in the recruitment or use of child soldiers." Id. § 1182(a)(3)(D) ; id. § 1182(a)(6)(G) ; id. § 1182(a)(3)(G).
Importantly, most of the categories of inadmissible classes of aliens Congress sets forth in Section 1182(a) relate to past conduct by an alien that renders the alien particularly dangerous to the interests of the United States. E.g. , § 1182(a)(2) ; § 1182(a)(3) ; § 1182(a)(6)(E) ; § 1182(a)(8)(B) ; § 1182(a)(9)(A). And, in accordance with Congress's decision to define categories of inadmissible aliens largely based on individual conduct and responsibility rather than considerations over which aliens have no control, none of the Section 1182(a) categories render a class of aliens inadmissible solely on the basis of religion or of race, sex, national origin, or other immutable characteristic.
Notwithstanding Congress's enumeration of the many general and specific categories and classes of aliens that the executive branch may or must deem inadmissible-and its failure to include any category defined by race, sex, national origin, or religion alone-the Government argues that, in enacting Section 1182(f), Congress delegated to the President the authority to deny entry to any class of aliens for any reason whatsoever, necessarily including for invidiously discriminatory reasons. Appellants' Br. at 29-30. But in construing a statutory provision, we must, if at all possible, avoid a construction "that would render another provision [in the same statute] superfluous." Bilski v. Kappos , 561 U.S. 593, 607-08, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). And reading Section 1182(f) as conferring on the President the unbridled authority to deny entry to any class of aliens would impermissibly render superfluous the numerous specific classes of inadmissible aliens that Congress has enumerated in Section 1182(a). See Hawai'i , 878 F.3d at 687 ("The Executive cannot without the assent of Congress supplant its statutory scheme with one stroke of a presidential pen.").
*336 The District of Columbia Circuit reached an identical conclusion in Abourezk v. Reagan , 785 F.2d 1043 (D.C. Cir. 1986) (Ginsburg, J.). There, the court considered 8 U.S.C. § 1182(a)(27) ("Subsection (27)"), which required the Attorney General to exclude an alien if the Attorney General had reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest or endanger the welfare, safety, or security of the United States." 785 F.2d at 1047 (internal quotation marks omitted) (quoting 8 U.S.C. § 1182(a)(27) (1982) ). The question at issue was whether Subsection (27) allowed the Attorney General to "exclude aliens whose entry might threaten [United States'] foreign policy objectives simply because of their membership in Communist organizations," id. at 1057, when an adjacent provision in the statute, 8 U.S.C. § 1182(a)(28) ("Subsection (28)"), specifically dealt with exclusion of aliens who were or previously had been members of any Communist party, Abourezk , 785 F.2d at 1048. Then-Judge (now Justice) Ginsburg concluded that reading the Attorney General's vague and generalized delegated authority under Subsection (27) to allow exclusion on such a basis would impermissibly render Subsection (28) "superfluous." Id. at 1057.
"To preserve the significance of both sections, and the congressional intent that guided their adoption," the court held that the Attorney General could not rely on Subsection (27) to exclude aliens who were or had been members of a Communist party unless "the reason for the threat to the 'public interest[,] ... welfare, safety, or security' " that the Attorney General put forward as a basis for barring entry under Subsection (27) was "independent of the fact of membership in or affiliation with the proscribed organization." Id. at 1058 (alterations in original) (quoting 8 U.S.C. § 1182(a)(27) ). Put differently, the court prohibited the executive branch from using the general exclusionary authority conferred by Congress in Subsection (27) to circumvent the more specific provision in Subsection (28) dealing with exclusion of aliens affiliated with the Communist party. Id. at 1057-58.
For the same reason, the President's reliance on Section 1182(f) as a basis for the Proclamation's ban on entry also is inconsistent with Section 1182(a)(3)(B), which includes "specific criteria for determining terrorism-related inadmissibility." See Kerry v. Din , --- U.S. ----, 135 S.Ct. 2128, 2140, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring). Recall that the Proclamation justified the Proclamation's ban on entry, in part, on grounds that there was a terrorist presence in certain of the countries and, therefore, that admitting aliens from those countries would be detrimental to the interests of the United States. See supra Part I.B.
Section 1182(a)(3)(B) renders inadmissible aliens who have been, are, or may in the future be connected to or engaged in terrorist activity, including aliens who have "engaged in a terrorist activity"; those whom government officials know or have reasonable cause to believe are "likely to engage after entry in any terrorist activity"; those who have "incited terrorist activity"; and those who "endorse[ ] or espouse[ ] terrorist activity or persuade[ ] others to" do so or who "support a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i). That subsection also provides detailed definitions of "terrorist activity," a "terrorist organization," the act of "engag[ing] in terrorist activity," and a "representative" of a terrorist organization. Id. § 1182(a)(3)(B)(iii)-(vi).
Congress established these "specific criteria for determining terrorism-related inadmissibility,"
*337 Din , 135 S.Ct. at 2140, against the backdrop of the executive branch's exclusion of aliens based on "mere membership in an organization, some members of which have engaged in terrorist activity" even when there was no indication that the alien seeking admission was himself engaged in such activity. H.R. Rep. No. 100-882, at 19 (1988). By enacting specific provisions regarding the inadmissibility of aliens who are or have been engaged in terrorist activity, Congress sought to make clear that "the definitions of 'terrorist activity' and 'engages in terrorist activity' must be applied on a case by case basis" and that "simple membership in any organization ... is not per se an absolute bar to admission to the United States"-whether under the President's general authority to bar entry or otherwise. Id. at 30. If Congress has deemed it unlawful for the President to absolutely bar the entry of aliens who are members of an organization that includes some members who engage in terrorism, it defies logic that Congress delegated to the President in Section 1182(f) the far broader power to absolutely bar the entry of aliens who happen to have been born in a particular country , within the borders of which some individuals have engaged in terrorism. Indeed, under such reasoning the President would be entitled to ban entry of all nationals from the numerous European countries-including France, Germany, and the United Kingdom-in which terrorists acts have been planned and committed.
Likewise, the Proclamation's reliance on the inadequacy of the subject countries' vetting capabilities and processes as a basis for the ban on entry is inconsistent with the Visa Waiver Program, which specifically addresses how the executive branch should handle differences among foreign countries with respect to information-sharing and identity management practices. 8 U.S.C. § 1187. In particular, Congress identified specific criteria, which the Proclamation expressly incorporates, relating to countries' data-management and information-sharing practices-such as usage of electronic passports, reporting of lost or stolen passports, and sharing of information on whether a prospective entrant poses a threat to national security-that the executive branch should consider in determining whether a country's nationals should be allowed to enter the United States without a visa. Id. § 1187(c). Significantly, Congress did not deem failure to satisfy these criteria as a basis for excluding a country's nationals. Rather, a country's failure to satisfy these criteria simply means its nationals may not enter without a visa. As the Ninth Circuit recognized, "the Proclamation ... conflicts with the purpose of the Visa Waiver Program," which reflects Congress's considered judgment as to how "the reality that countries vary with respect to information-sharing and identity-management practices" should impact the vetting of aliens for entry. Hawai'i , 878 F.3d at 686.
The inconsistencies between the President's claimed authority under Section 1182(f) and Section 1182(a)(3)(B) and the Visa Waiver Program are precisely why courts apply the canon of statutory construction "that the specific governs the general." RadLAX Gateway Hotel, LLC v. Amalgamated Bank , 566 U.S. 639, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) (internal quotation marks omitted). When, as here, a statute includes "a general authorization [ Section 1182(f) ] and a more limited, specific authorization [ Section 1182(a)(3)(B) and the Visa Waiver Program] ... side-by-side," that canon requires that "[t]he terms of the specific authorization must be complied with" to avoid "the superfluity of a specific provision that is swallowed by the general one."
*338 Id. Accordingly, for example, Section 1182(a)(3)(B), not Section 1182(f), is the congressionally authorized mechanism for the President to deny entry to aliens whom he concludes are detrimental to the United States because they pose a threat of engaging in terrorist activities. See Abourezk , 785 F.2d at 1049 n.2 ("The President's sweeping proclamation power [under Section 1182(f) ] thus provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the categories in section 1182(a) ." (emphasis added) ). And the Visa Waiver Program is the congressionally authorized mechanism for the President to deal with aliens from countries that fail to maintain or share adequate information regarding their nationals.
Interpreting Section 1182(f) to allow the President to suspend the entry of aliens based solely on their race, sex, nationality, or other immutable characteristics also would conflict with 8 U.S.C. § 1152(a), which provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." Congress passed Section 1152(a) in 1965, more than a decade after it enacted Section 1182(f), as part of a comprehensive revision to the Immigration Act intended to eliminate nationality-based discrimination in the immigration system. See infra Part I.C.3.
Section 1152(a) deals with issuance of immigrant visas , rather than entry, which is governed by Section 1182. Nonetheless, reading Section 1182(f) as authorizing the President to deny entry based on invidious discrimination would place Section 1182(f) in conflict with Section 1152(a), which prohibits invidious discrimination in the issuance of visas. In particular, the Immigration Act authorizes the executive branch to refuse to issue a visa to any alien who "is ineligible to receive a visa or such other documentation under section 1182." 8 U.S.C. § 1201(g). As the Government concedes, the President's exercise of his authority under Section 1182(f) to deny entry to aliens from the six predominantly Muslim countries, were it lawful, also would bar, by virtue of Section 1201(g), such aliens from obtaining visas, including immigrant visas. This would be the very result Congress sought to avoid in ending nationality-based discrimination in the issuance of immigrant visas through its passage of Section 1152(a).
Accordingly, Section 1182(f) 's function within the Immigration Act does not clearly indicate that Congress intended to delegate to the President the authority to suspend the entry of aliens based on invidious discrimination. On the contrary, construing Section 1182(f) as broadly authorizing the President to engage in invidious discrimination in denying entry would render superfluous the numerous categories of inadmissible aliens Congress took pains to identify in Section 1182(a), including the provisions directly addressing aliens who pose a risk of engaging in terrorist activities or are nationals of countries with inadequate vetting procedures, and conflict with Section 1152(a) 's prohibition on discrimination based on race, sex, nationality, and other immutable characteristics.
3.
Reading the Immigration Act as allowing the President to deny entry to classes of aliens based on invidious discrimination also would contradict the "object and policy" underlying the Immigration Act. See U.S. Nat'l Bank of Or. , 508 U.S. at 455, 113 S.Ct. 2173. Although the specific language of Section 1182(f) dates to the Korean War, Congress "comprehensive[ly] revis[ed]" the Immigration Act in 1965 (the *339 "1965 Revisions"). S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2 , 88th Cong. 78 (1964) (statement of Sen. Fong). Those revisions were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights movement with the express purpose of "eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States." H.R. Rep. No. 89-745, at 8 (1965); see also S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 3 , 88th Cong. 107 (1964) (statement of Sen. Hart) ("A law that says that one man is somewhat less than another simply because of accident of his place of birth is not tolerable in the year 1964. A formula based on equality and fair play must be enacted. Selection should be based primarily on questions of our own national interest.").
Prior to the 1965 Revisions, the Immigration Act employed nationality-based quotas, limiting the number of immigrants admissible to the nation each year based on nation of birth. President Kennedy called on Congress to repeal the nationality-based quota system, condemning it as a system "without basis in either logic or reason" that "neither satisfie[d] a national need nor accomplishe[d] an international purpose" but instead "discriminate[d] among applicants for admission into the United States on the basis of accident of birth." Letter to the President of the Senate and to the Speaker of the House on Revision of the Immigration Laws, 1963 PUB. PAPERS 594, 595 (July 23, 1963). After President Kennedy's assassination, President Johnson renewed Kennedy's request for "the elimination of the national origins quota system," which he described as "incompatible with our basic American tradition" and "our fundamental belief that a man is to be judged-and judged exclusively-on his worth as a human being." Special Message to the Congress on Immigration, 1965 PUB. PAPERS 37, 37, 39 (Jan. 13, 1965).
The 1965 Revisions answered President Kennedy's and President Johnson's calls. Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system to "firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman." S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1 , 88th Cong. 4 (1964) (statement of Sen. Kennedy). Time and again Congress connected the need to eliminate the nationality-based quota system to American "tenets of equality irrespective of race, creed, or color" and emphasized that abolishing nationality-based quotas "demonstrat[ed] to the whole world that we practice what we preach, and that all men are equal under law." S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2 , 88th Cong. 100-01 (1964) (statement of Sen. Fong); see also id. Vol. 1 , at 9 (statement of Sen. Hart) (explaining that the 1965 Revisions abolished the "irrational ... national origins concept, which said in clear and echoing words that the people of some nations [we]re more welcome to America than others" based on "[a]rbitrary ethnic and racial barriers").
Upon signing the bill into law at Liberty Island, New York, President Johnson lauded the end of the nationality-based discrimination that previously defined the American system of immigration, describing the 1965 Revisions as abolishing "the *340 harsh injustice of the national origins quota system," which "violated the basic principle of American democracy-the principle that values and rewards each man on the basis of his merit as a man." 1965 PUB. PAPERS 1037, 1038-39 (Oct. 3, 1965). As a result of the 1965 Revisions, immigrants would be permitted to come to America "because of what they are, and not because of the land from which they sprung ." Id. at 1039 (emphasis added).
To effect its purpose of eliminating discrimination in the immigration system, Congress stripped the Immigration Act of all provisions expressly authorizing national origin-based invidious discrimination and added Section 1152(a)(1) 's prohibition on discrimination in the issuance of visas based on nationality and other immutable characteristics, such as race. As evidenced by Section 1152(a)(1), disregarding national origin in selecting which immigrants to admit to the United States remains a core principle of United States immigration policy. Far from evidencing "any clear indication" that Congress intended the President to have the authority to exercise his Section 1182(f) powers based on invidious discrimination, the "object and policy" of the Immigration Act suggest that Congress did not intend to grant the President unbridled authority to engage in invidious discrimination when deciding whether and to what extent to suspend alien entry.
The Government points to a number of orders promulgated by Presidents pursuant to their authority under Section 1182(f) as evidence that that statutory provision authorizes the President to engage in national-origin-based discrimination. But the previous orders the Government cites materially differ from the Proclamation, in that they did not suspend the entry of classes of aliens based on national origin alone, let alone use national origin as a proxy to suspend the entry of a class of aliens based on another invidiously discriminatory basis, such as religion. See Proclamation 8693 (July 24, 2011) (suspending the entry of aliens subject to travel bans issued by the United Nations Security Council's resolution barring member nations from permitting the entry of individuals who threaten peace in various nations); Proclamation 8342 (Jan. 22, 2009) (suspending the entry of senior government officials "who have impeded their governments' antitrafficking efforts, have failed to implement their governments' antitrafficking laws and policies, or who otherwise bear responsibility for their governments' failures to take steps recognized internationally as appropriate to combat trafficking in persons"); Proclamation 6958 (Nov. 22, 1996) (suspending the entry of "members of the Government of Sudan, officials of that Government, and members of the Sudanese armed forces" based on the Sudanese government's harboring of individuals who attempted to assassinate the Egyptian President in Ethiopia, in violation of Ethiopian sovereignty); Executive Order No. 12,807 (May 24, 1992) (suspending the entry of "undocumented aliens [entering the United States] by sea" during the mass exodus of Haitian nationals fleeing a military coup, often in dangerous and overcrowded sea vessels); Proclamation 5887 (Oct. 22, 1988) (suspending the entry of "officers and employees" of the Nicaraguan government as nonimmigrants to the United States based on the Nicaraguan government's "unjustified expulsion" of American diplomats and "long-standing ... suppression of free expression and press and support of subversive activities throughout Central America"); Proclamation 5829 (June 10, 1988) (suspending the entry of "Panamanian nationals ... who formulate or implement the policies of Manuel Antonio Noriega and Manuel Solis Palma" due to those officials' act of "preventing the legitimate government ...
*341 from restoring order and democracy" to Panama).
Of the proclamations and executive orders cited by the Government, President Reagan's suspension on the entry of Cuban nationals as immigrants comes closest to a nationality-based suspension on alien entry. Proclamation 5517 (Aug. 22, 1986). But that executive action was not challenged as a violation of either Section 1182(f) or Section 1152(a)(1), and therefore the judiciary never had the opportunity to address whether the order complied with those provisions or the Constitution. Nor does a single, unchallenged executive action "demonstrate the kind of consistent administrative interpretation necessary to give rise to a presumption of congressional acquiescence." Abourezk , 785 F.2d at 1056.
* * * * *
In sum, the language of Section 1182(f), related provisions in the Immigration Act, and the "object and policy" of the statute do not "explicitly" state, much less provide a "clear indication," that Congress intended to delegate to the President wholly unconstrained authority to deny entry to any class of aliens, including based on invidiously discriminatory reasons. See Zadvydas , 533 U.S. at 697, 121 S.Ct. 2491. Accordingly, the Proclamation's ban on entry-which this Court finds was borne of the President's animus against Muslims and his intent to rely on national origin as a proxy to give effect to that animus-exceeds the authority Congress conferred on the President in the Immigration Act. As Judge Friendly put it, "Congress could not have intended to make relevant" to the President's exercise of his delegated authority to suspend the entry of aliens "invidious discrimination against a particular race or group." Wong Wing Hang , 360 F.2d at 719 (internal quotation marks omitted).
II.
A.
The separate concurring opinions of Chief Judge Gregory and Judge Keenan make compelling arguments that Section 1182(f) poses additional constraints on the President's authority to deny entry to classes of aliens, beyond simply precluding the President from exercising his delegated authority based on invidious discrimination, as I conclude. In particular, Chief Judge Gregory would hold that, " § 1182(f) is a gap-filling provision that empowers the President to exclude (1) foreign nationals whose individual conduct or affiliation makes their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals in response to a foreign-affairs or national-security exigency." Ante at 296. Chief Judge Gregory's conclusion as to the full scope of the authority conferred on the President by the Immigration Act to deny entry to classes of aliens may prove correct. But I decline to join his opinion's statutory analysis because we need not define the full scope of the President's authority under the Immigration Act to resolve Plaintiffs' statutory claim. Rather, it is sufficient that we find that whatever authority the Immigration Act delegates to the President to deny entry to classes of aliens, that authority does not encompass invidious discrimination on the basis of race, sex, national origin, or religion.
Additionally, in rendering his conclusion as to the full scope of authority conferred on the President by Section 1182(f), Chief Judge Gregory's opinion addresses complex and unresolved constitutional questions regarding the allocation of authority over immigration regulation between Congress and the President, the scope of Congress's authority to delegate its powers, and the President's inherent power to control *342 and protect our borders. But given that we generally should avoid unnecessarily resolving novel and complex constitutional questions, Leroy v. Great W. United Corp. , 443 U.S. 173, 181, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), and that I have no trouble resolving Plaintiffs' statutory claims without reaching the additional constitutional issues addressed in Chief Judge Gregory's opinion, I would leave those questions for another day.
Judge Keenan's concurring opinion also concludes that the Proclamation exceeds the President's authority under Section 1182(f). Ante at 314-15. Her opinion does not simply conclude, however, that Section 1182(f) does not authorize the President to engage in invidious discrimination-discrimination for its own sake-on the basis of race, sex, national origin, or religion, as I conclude. Rather, Judge Keenan's opinion further determines that the Proclamation's lack of temporal limitation conflicts with the plain language of Section 1182(f), which authorizes the President to "suspend" entry of a class of aliens. Id. at 314. And her opinion concludes that "the President failed to make the necessary findings to support his invocation of authority under Section 1182(f)." Id. at 316.
Each of these additional determinations rests on thoughtful and persuasive analysis of the governing statutory language and the text of the Proclamation. But her opinion's proposed construction of the statute would impose additional constraints on the President's authority under Section 1182(f), requiring him to specify a duration, in some form, for any suspension on entry and provide greater specificity as to the reasons entry of a particular alien or class of aliens would be detrimental to the interests of the United States. Because any construction of Section 1182(f)"will operate against future Presidents under future circumstances as yet unknown," post at ----, I am wary of unnecessarily circumscribing the President's authority under Section 1182(f), particularly when I am confident that that there are no circumstances in which it would be proper for the President to exercise his authority under Section 1182(f) on the basis of invidious discrimination-a proposition that the Government does not dispute. See Oral Arg. Rec. 11:35-12:20; cf. Korematsu , 323 U.S. at 247, 65 S.Ct. 193 (Jackson, J., dissenting) ("[A] civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority.").
B.
Like the Government-which concedes that the President cannot use "forbidden traits" in exercising his authority under Section 1182(f), Oral Arg. Rec. 11:35-12:20-the separate opinion of my colleague Judge Niemeyer acknowledges that Section 1182(f) does not authorize the President to engage in invidious discrimination in denying entry to classes of aliens, post at 372 ("[I]t is surely correct that Congress did not authorize 'invidious discrimination' in conferring authority on the President in § 1182(f)...."). Nor does Judge Niemeyer dispute the majority opinion's determination that, as a factual matter, in promulgating the Proclamation the President sought to advance his repeatedly stated goal of invidiously discriminating against Muslims.
Rather, Judge Niemeyer's opinion maintains that ascertaining the President's actual purpose in promulgating the Proclamation is irrelevant to our determination as to whether the Proclamation complies with the Immigration Act and the Constitution. In particular, Judge Niemeyer maintains that the Proclamation complies *343 with Section 1182(f) and the Constitution because the face of the Proclamation sets forth a plausible national security justification for the indefinite ban on entry and does not provide any evidence that the Proclamation was motivated by invidious discrimination. Post at 353-55. Put differently, according to Judge Niemeyer, any facts outside of the four corners of the Proclamation do not constitute competent evidence of the President's purpose in promulgating the Proclamation.[7] Id. at 364-65. For several reasons, I respectfully disagree with the separate views of my colleague Judge Niemeyer.
To begin, Judge Niemeyer's position-that the President's statements do not constitute competent evidence of his purpose in promulgating the Proclamation-runs contrary to how courts treat such evidence in most other legal contexts. Of particular relevance, the Supreme Court has recognized that "contemporary statements by members of the decisionmaking body" are "highly relevant" to determining whether a governmental body acted with discriminatory intent-even when the action is nondiscriminatory on its face. Vill. of Arlington Heights v. Metro. Housing Dev. Corp. , 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (emphasis added). To that end, the Court repeatedly has relied on a decisionmaker's statements as evidence of the decisionmaker's discriminatory animus. See, e.g. , Staub v. Proctor , 562 U.S. 411, 413-15, 422-23, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011) (relying on supervisors' statements as evidence that they took adverse employment actions based on antimilitary discriminatory animus); Ash v. Tyson Foods, Inc. , 546 U.S. 454, 456-57, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (holding that decisionmaker's alleged use of term "boy" to refer to African-American employees was evidence of discriminatory animus). Given that contemporary statements of members of a decisionmaking body are "highly relevant" to ascertaining the body's intent in taking a challenged action, Arlington Heights , 429 U.S. at 268, 97 S.Ct. 555, contemporary statements by a unitary decisionmaker-like the President-provide particularly strong evidence of the decisionmaker's intent in taking a challenged action, as the action does not reflect "a composite of manifold choices," League of United Latin Am. Citizens v. Perry , 548 U.S. 399, 418, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (opinion of Kennedy, J.).
Likewise, the Supreme Court has relied on contemporary statements by governmental actors to find that a statute or other governmental action violated the Establishment Clause because it was intended to advance a sectarian purpose or discriminate against a disfavored religion. See, e.g. , McCreary Cty. , 545 U.S. at 851, 869-70, 125 S.Ct. 2722 (holding that copies of the Ten Commandments posted in municipal courtrooms were hung to advance sectarian purpose, in part based on statements made by judicial official at the time the Commandments were posted); Edwards v. Aguillard , 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (relying on statements by sponsor of legislation requiring teaching of "creation science" alongside evolution in public school science courses to find statute was intended to "discredit[ ] evolution" and therefore violated Establishment Clause (internal quotation omitted) ). Notably, Edwards relied on such statements to determine that the governmental body acted with unconstitutional sectarian intent, notwithstanding *344 that the face of the challenged statute revealed no sectarian purpose-as Judge Niemeyer maintains is the case with the Proclamation. Edwards , 482 U.S. at 586-87, 107 S.Ct. 2573 ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham ." (emphasis added) ).
And in criminal law, courts routinely rely on a defendant's statements to establish that the defendant intended to commit, and did in fact commit, a crime. See, e.g. , Roper v. Simmons , 543 U.S. 551, 555, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (finding that there was "little doubt" habeas petitioner was the "instigator" behind a burglary and murder when "[b]efore its commission [the petitioner] said he wanted to murder someone"); Roberts v. Louisiana , 428 U.S. 325, 340, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (White, J., dissenting) (noting that jury convicted and sentenced to death habeas petitioner for murder of store clerk when, prior to murder, petitioner said "he had 'always wanted to kill a white dude' "). Courts and juries rely heavily on defendants' statements regarding their past actions and intent because "[t]he admissions of a defendant comes from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." Arizona v. Fulminante , 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (emphasis added) (internal quotation marks omitted).[8]
Accordingly, Judge Niemeyer's assertion that this Court must close its eyes to the President's own statements indicating that he intended for the Proclamation to give effect to his anti-Muslim animus-statements by "the most knowledgeable and unimpeachable source of information" about the motivation behind the Proclamation's suspension on entry, id. -stands in sharp contrast to the approach the Supreme Court takes in most cases, including analogous cases involving religious discrimination. Indeed, in arguing that the President's official statements regarding the suspension on entry are not competent evidence of the Proclamation's purpose, Judge Niemeyer's dissenting opinion essentially takes the position that evidence that is competent to convict a defendant of murder-and thereby render the defendant eligible for our society's most serious punishment-is not competent to establish a President's intent in promulgating an immigration policy. Neither justice nor law draws such a distinction.
Closing one's eyes to the President's official statements regarding the suspension on entry-as Judge Niemeyer suggests-also runs contrary to the duty the law usually imposes on the public, attorneys, and judges not to ignore probative information. For example, numerous statutes forbid members of the public from acting as "an ostrich, hiding [their] head in the sand from relevant information." Greenhouse v. MCG Capital Corp. , 392 F.3d 650, 656 (4th Cir. 2004) (holding that *345 securities fraud statute and regulation does not permit an investor to recover if he closed his eyes to relevant information); see also, e.g. , United States v. Plowman , 700 F.3d 1052, 1058 (7th Cir. 2012) ("The transcripts overwhelmingly show that [the defendant] was not entrapped into accepting the bribe. In reviewing the district court's pretrial decision, we are not required to close our eyes to that indisputable evidence."); Boroff v. Tully (In re Tully) , 818 F.2d 106, 111 (1st Cir. 1987) (holding that the bankruptcy code forbids a debtor from obtaining a discharge if the debtor made inaccurate representations to the court as a result of willfully ignoring relevant information because a "debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath"). Similarly, the law often allows a defendant to be held criminally liable for closing his eyes to-being "deliberately ignorant" of-facts establishing that he was engaging in a criminal offense. See, e.g. , United States v. Salinas , 763 F.3d 869, 878-79 (7th Cir. 2014) ; United States v. Clifton , 587 Fed.Appx. 49, 53-54 (4th Cir. 2014) ; see also Global-Tech Appliances, Inc. v. SEB S.A. , 563 U.S. 754, 766-67, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) (approving of "willful blindness" standard of knowledge in induced patent infringement cases).
Likewise, pursuant to the rules of procedure, courts bar attorneys from closing their eyes to contrary authority or facts not supportive of their position. See, e.g. , Mays v. Springborn , 719 F.3d 631, 634 (7th Cir. 2013) (criticizing government attorneys as acting like "ostrich[es]" when they failed to inform a district court of numerous controlling decisions that contradicted the instruction the court intended to provide to the jury); City of Livonia Emps. Ret. Sys. & Local 295/Local 851 v. Boeing Co. , 711 F.3d 754, 762 (7th Cir. 2013) (remanding case to district court to determine whether to impose Rule 11 sanctions against attorney when evidence showed attorney intentionally failed to verify information from confidential source alleged in complaint). And both the Supreme Court and lower courts have recognized that the judiciary generally must not close its eyes to relevant facts and evidence in deciding cases. McCreary Cty. , 545 U.S. at 863-64, 125 S.Ct. 2722 (criticizing the dissenting opinion for ignoring extra-statutory statements bearing on governmental officials' intent behind posting the Ten Commandments because doing so "cut the context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances"); Dellavecchia v. Sec'y Penn. Dep't of Corr. , 819 F.3d 682, 696 (3d Cir. 2016) (holding that in determining whether a habeas petitioner is entitled to relief, " 'we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court....' " (quoting Milton v. Wainwright , 407 U.S. 371, 377, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) ) ).
The rationale for such rules is straightforward. Closing one's eyes to probative information creates a risk of rendering an errant decision based on an incorrect or incomplete understanding of the relevant facts. Ignoring relevant information-particularly when, as with the President's statements regarding the suspension on entry, the information is widely known and disseminated-also undermines judicial legitimacy by making the public believe judicial decisions rest on a false or inaccurate characterization of the governing facts. Cf. McCreary Cty. , 545 U.S. at 874, 125 S.Ct. 2722 ("[A]n implausible claim that a governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense."). And *346 by creating a disconnect between judicial decisions and the underlying facts, it prevents parties from having to internalize the consequences of their actions. See Tully , 818 F.2d at 110 (explaining that provision in bankruptcy code that prevents debtor who was deliberately ignorant of key facts relating to his bankruptcy filing from obtaining discharge because that provision "make[s] certain that those who seek shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs"). For all these reasons, it is patently inconsistent with principles of fairness and justice to allow the Government to "disclaim all responsibility for statements" by the President regarding his Proclamation . Id. at 111.
To be sure, there are exceptional cases in which courts disregard probative evidence when doing so advances other legal or constitutional values. For example, the rules of evidence prohibit admission of certain types of evidence, like hearsay, which the rules deem sufficiently unreliable or unduly prejudicial. Likewise, the exclusionary rule bars consideration of evidence obtained in violation of a criminal defendant's constitutional rights to encourage law enforcement officers to act in accordance with constitutional protections. See Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ; Mapp v. Ohio , 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
But there is no question that the President's statements upon which the majority relies, which were widely reported and disseminated, provide reliable evidence of the President's intent. The Government acknowledges that the President's tweets, for example, constitute "official" statements of the President. J.A. 794, 1521.
And the only constitutional value that Judge Niemeyer identifies as being advanced by ignoring the President's statements is the judiciary's obligation to defer to the political branches regarding their policy judgment as to national security issues. See ante at 360-62. Judge Niemeyer, however, does not explain how refusing to consider evidence pertaining to the President's purpose in promulgating the Proclamation advances that interest. The majority opinion relies on those statements not to "second-guess U.S. foreign policy," post at 353, but to determine what foreign policy the President intended his Proclamation to serve: the purpose on the face of the Proclamation of minimizing national security risks posed by countries that fail to maintain and share adequate information regarding their nationals-a policy from which the President repeatedly sought to distance himself, J.A. 791, 832-or the President's repeatedly stated purpose of banning Muslims. Only after using the President's statements to ascertain his foreign policy purpose behind the Proclamation's suspension on entry-to invidiously discriminate against Muslims-did this Court invalidate that policy. Importantly, the Government concedes that denying entry to a class of aliens based on invidious discrimination does not comply with the Constitution, Oral Arg. Rec. 11:35-12:20, meaning that to the extent this Court "second-guesses" the President's foreign policy determination set forth in the Proclamation, it does so in accordance with the Government's own understanding of the Constitution.
By seeking to determine the President's true purpose behind the Proclamation's ban on entry, the majority opinion arguably more effectively respects the President's policy judgments because it seeks to determine and evaluate the President's own policy determination, not the policy rationale of the President's unelected subordinates and attorneys, with which the *347 President has repeatedly expressed disagreement. To be sure, this Court ultimately concludes that the President's actual purpose behind the Proclamation's suspension on entry contravenes the Constitution-a legal conclusion with which the Government appears to agree. Oral Arg. Rec. 11:35-12:20. But we do so by considering the policy the President actually sought to advance , not by considering policy rationales with which the President has expressed disagreement. In doing so, we afford the President the respect to which he is entitled as the unitary executive he is-the constitutional officer with sole and final authority to establish executive branch foreign policy and to deny entry to classes of aliens under Section 1182(f), in particular.
Failing to ascertain and address the President's actual purpose in promulgating his Proclamation-as Judge Niemeyer proposes we do-would raise other constitutional problems. In particular, ruling on the legality of the Proclamation without considering the President's actual-and widely proclaimed-purpose would "blur[ ] the lines of political accountability." Nat'l Fed. of Indep. Business v. Sebelius , 567 U.S. 519, 678, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (Scalia, J., dissenting); see also New York v. United States , 505 U.S. 144, 168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Voters would be confused as to whether the Proclamation advances the President's promise to ban entry of Muslims, as the President has proclaimed, or is intended to prevent entry of aliens from countries that fail to maintain or share adequate information regarding their nationals, as the Government and the Proclamation claims. Voters, therefore, would not know which policy to hold the President accountable for at the polls. Concerns over the blurring lines of political accountability are particularly salient here because the President has repeatedly-and publicly-distanced himself from the foreign policy rationale that the Government and Judge Niemeyer would rely on to uphold the Proclamation. J.A. 791, 832.
Rather than addressing the President's actual purpose in promulgating his Proclamation, Judge Niemeyer appeals to facts that do not exist and then draws upon those facts to argue that the majority opinion undertakes a forbidden intrusion on our constitutional structure. In particular, Judge Niemeyer claims that "if the United States were to enter into a state of war with a foreign nation or were attacked by foreigners, their preferred construction would wreak havoc by precluding entry restrictions that would be necessary in such a time of crisis." Post at 370. But those are not the facts of this case. Congress has not declared war against any of the countries subject to the ban on entry. Nor have any of those countries attacked the United States. Accordingly, the scope of the President's authority under Section 1182(f) or the Constitution to exclude foreigners in a time of war or in response to an attack is not at issue.
Under the undisputed facts of this case, Judge Niemeyer's separate opinion fashions a legal barrier to the consideration of evidence establishing the President's goal of invidiously discriminating against Muslims. Put differently, Judge Niemeyer relies on a novel evidentiary rule to "reconstruct" the facts of this case so as to elide the difficult facts the majority correctly confronts. To that end, applying his own evidentiary rule, Judge Niemeyer nowhere addresses, for example, statements by the drafter of the first iteration of the travel ban, which explained that the President's purpose behind banning nationals from the predominantly Muslim countries-nearly all of which are subject to the Proclamation's indefinite suspension on entry-was to discriminate against Muslims. J.A. 808-10, *348 815-16. Judge Niemeyer nowhere addresses the President's repeated statements expressing disagreement with the policy rationales upon which the Government and his separate opinion rely. See, e.g. , J.A. 791. Judge Niemeyer nowhere addresses the numerous anti-Muslim statements made by the President before and after he took office, many of which the President directly tied to the travel ban. See, e.g. , J.A. 135, 311, 806, 814-20. And Judge Niemeyer nowhere addresses the President's retweeting of anti-Muslim videos created by an extremist political party that opposes Islam, and the Administration's express connection of those retweets to the Proclamation's ban on entry.[9] J.A. 1497-99, 1502-03, 1508.
Thus, to avoid the result that inexorably follows from the legal rule that he concedes-that Section 1182(f) does not authorize the President to engage in invidious discrimination-and the application of that rule to the undisputed facts-that the President promulgated the Proclamation to advance his goal of banning Muslims-Judge Niemeyer creates a novel rule of evidence that permits the disregarding of undisputed facts. This "result-oriented" approach-under which the judiciary picks and chooses among facts and law to achieve a desired outcome, rather than confronts the facts and law as presented by the case-bears the hallmarks of what is widely decried as judicial activism. Lawrence v. Texas , 539 U.S. 558, 592, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (Scalia, J., dissenting); Engle v. Isaac , 456 U.S. 107, 144, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (Brennan, J., dissenting).
Judge Niemeyer further argues that my conclusion that Congress did not authorize the President to engage in invidious discrimination in denying entry to classes of aliens has no basis in the language of the Section 1182(f). Post at 372. But, as explained above, my conclusion that Section 1182(f) does not authorize invidious discrimination flows from both (1) Section 1182(f) 's express requirement that the President find that admission of any class of excluded aliens would be "detrimental to the interests of the United States" and (2) the numerous specific bases for denying entry to aliens set forth by Congress in Section 1182, none of which authorize denying entry to classes of aliens based on invidious discrimination. See supra Part I.C.1. And even if the statutory language of Section 1182 did not support my construction, the Supreme Court has on numerous occasions read "implicit limitation[s]" into immigration statutes to avoid constitutional concerns. Zadvydas , 533 U.S. at 689, 121 S.Ct. 2491 ; see also, e.g. , Witkovich , 353 U.S. at 199, 202, 77 S.Ct. 779. Judge Niemeyer does not address, much less distinguish, these cases.
Judge Niemeyer also suggests that holding that Section 1182(f) does not authorize the President to engage in invidious discrimination would impermissibly *349 "create constitutionally based rights in aliens excludable under § 1182(f)... when they never heretofore had such rights." Post at 372. Again, Judge Niemeyer misstates the approach I take in construing Section 1182(f). Contrary to his characterization, I recognize that aliens "can claim few, if any, rights under the Constitution." See supra Part I.B. I nonetheless conclude that interpreting Section 1182(f) as authorizing invidious discrimination raises serious constitutional concerns because "when the President exercises [his authority to exclude aliens] based solely on animus against a particular race, sex, nationality, or religion, there is a grave risk-indeed, likelihood-that the constitutional harm will redound to individuals who can claim constitutional rights ." Id. (emphasis added). These rights include not being barred from marrying the partner of one's choice based solely on the partner's race, nationality, or religion, and not having one's race or religion be the subject of state-sanctioned discrimination. Id. My interpretation of Section 1182(f), therefore, is grounded in the rights of citizens and lawful residents, not aliens, as Judge Niemeyer claims.
At bottom, the approach taken by Judge Niemeyer is the same approach embraced by the Government to avoid the outcome that flows from application of the undisputed law to the President's undisputed statements of discriminatory intent. Just as the Government would have us ignore the President's very words demonstrating his goal of invidiously discriminating against Muslims, Judge Niemeyer would have us ignore as irrelevant the undisputed legal conclusion that Section 1182(f) does not authorize invidious discrimination.
The Government seeks the normative result of what "ought to be" rather than what "is." by displacing the President's undisputed policy goal with the policy judgments of his unelected subordinates. Likewise, following the evidentiary approach outlined by Judge Niemeyer creatively interjects the onus of national security so as to avoid confronting the more difficult question that arises from the undisputed facts establishing that invidious discrimination against Muslims lies at the heart of this case.
III.
In conclusion, invidious "discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life. It is unattractive in any setting but it is utterly revolting among a free people who have embraced the principles set forth in the Constitution of the United States." Korematsu , 323 U.S. at 242, 65 S.Ct. 193 (Murphy, J., dissenting). Yet if we rule in the Government's favor, we will effectively hold that, in enacting the Immigration Act, Congress intended to delegate to the President the power to deny entry to a class of aliens based on nothing more than such aliens' race, sex, national origin, or religion.
One might argue, that as a matter of statistical fact , Muslims, and therefore nationals of the predominantly Muslim countries covered by the Proclamation, disproportionately engage in acts of terrorism, giving rise to a factual inference that admitting such individuals would be detrimental to the interests of the United States. Indeed, viewing the Proclamation in its most favorable light, that is the precisely the rationale underlying the indefinite suspension on entry. Setting aside the question of whether that factual finding is true, or even reasonable-which is, at best, highly debatable given the 150 million people in the predominantly Muslim countries subject to the suspension on entry and the 1.6 billion Muslims worldwide-that is precisely the inference that the Framers of the Constitution and the Reconstruction Amendments concluded *350 was impermissible as a matter of constitutional law .[10] Id. at 240, 65 S.Ct. 193 (Murphy, J., dissenting). In particular, classifying individuals based solely on their race, sex, nationality, or religion-and then relying on those classifications to discriminate against a particular race, sex, nationality, or religion-necessarily results in placing special burdens on individuals who lack any moral responsibility, a result the Framers deemed antithetical to core democratic principles and destabilizing to our Republic. Id. Significantly, the Government does not dispute that proposition, conceding that the President would violate the Constitution if he banned entry of men-notwithstanding that as a matter of statistical fact men disproportionately commit acts of terrorism-because "under constitutional law you can't use forbidden traits [like gender] as a proxy, you have to target the actual conduct you are worried about ." Oral Arg. Rec. 11:35-12:20 (emphasis added).
Even though the Constitution affords greater latitude to the political branches to draw otherwise impermissible distinctions among classes of aliens, the harm to core constitutional values associated with governmental exercise of invidious discrimination-and the potential harm to individuals who can claim constitutional rights stemming from the abridgement of those values-demands evidence of "careful and purposeful consideration by those responsible for enacting and implementing our laws" before such discrimination should be sanctioned by the judiciary. Greene , 360 U.S. at 507, 79 S.Ct. 1400 (emphasis added). Because Congress did not provide any indication-let alone the requisite "explicit" statement-that it intended to delegate to the President the authority to violate fundamental constitutional values of equality and religious freedom in exercising his authority to deny entry to classes of aliens, I reject the Government's contention that the Proclamation complied with the Immigration Act.
In emphasizing the larger constitutional problems raised by construing the Immigration Act as a delegation of authority to engage in invidious discrimination, we must not forget that the Constitution embraces equality to forestall highly personal harms. Plaintiff John Doe #4, a lawful permanent resident, seeks to be reunited with his wife, an Iranian national, whom the Proclamation indefinitely bars from entering the United States. As Justice Jackson explained when confronted with another broad delegation of congressional authority over immigration, "Congress will have to use more explicit language than any yet cited before I will agree that it has authorized [the President] to break up the family of [a lawful permanent resident] or force him to keep his wife by becoming an exile." Knauff , 338 U.S. at 551-52, 70 S.Ct. 309 (Jackson, J., dissenting).
PAMELA HARRIS, Circuit Judge, with whom Judge Diana Gribbon Motz and Judge King join, concurring:
I agree with the majority that the plaintiffs are likely to succeed in their Establishment *351 Clause challenge to the Proclamation, and with its judgment largely affirming the district court's preliminary injunction. I write separately to explain why I think it is appropriate to decide this case on constitutional grounds alone, saving for another day the more far-reaching questions raised by the plaintiffs' statutory claims.
Ordinarily, of course, when a case can be decided on purely statutory grounds, we will stop there, and avoid reaching constitutional questions that also might be presented. See Ashwander v. Tenn. Valley Auth. , 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (citing Siler v. Louisville & Nashville R. Co. , 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909) ). But that is a rule of prudence, not an absolute command. See Zobrest v. Catalina Foothills Sch. Dist. , 509 U.S. 1, 7-8, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (describing and declining to apply "prudential rule of avoiding constitutional questions"); Md. Dep't of Human Res. v. U.S. Dep't of Agric. , 976 F.2d 1462, 1485-86 (4th Cir. 1992) (Hall, J.) (criticizing majority for failure to honor "prudential considerations" militating against unnecessary constitutional holdings). And for two principal reasons, I would not apply the constitutional avoidance canon here.
First, this is not a case that can be decided on statutory grounds "without reference to questions arising under the Federal Constitution," Siler , 213 U.S. at 193, 29 S.Ct. 451, as contemplated by Siler and Ashwander . That is partly a function of the government's position on justiciability: According to the government, review of the plaintiffs' statutory claims-but not their constitutional claims-is barred by the doctrine of consular non-reviewability, rooted in separation-of-powers principles. If adopted, in other words, the government's position would require us to dispose of this case on constitutional rather than statutory grounds. See Abourezk v. Reagan , 785 F.2d 1043, 1051-52 (D.C. Cir. 1986) (rejecting similar non-justiciability argument in part because it would force a "constitutional confrontation"). And to reject that position and proceed to the statutory claims, we would have to resolve important and difficult questions about the scope of a justiciability doctrine that itself rests on a constitutional rationale. See Third Cross-Appeal Br. for the Gov't at 5-6 (describing nonreviewability principle and its separation-of-powers rationale).
On the merits, as well, the statutory inquiry in this case is deeply intertwined with questions of constitutional law. See Abourezk , 785 F.2d at 1062-63 n.1 (Bork, J., dissenting) (noting in immigration case that statutory and constitutional questions "cannot so easily be broken apart"). In concluding that § 1182(f) and § 1185(a)(1) do not authorize the President's Proclamation, my colleagues engage in close constitutional analysis, finding that the government's broader reading of those provisions would raise serious questions with respect to the constitutional separation of powers and protection of individual rights. And the plaintiffs' entire statutory claim pivots on a question that goes to the heart of constitutional law: whether the President needs statutory authority to promulgate the Proclamation, or whether he may rely instead on inherent constitutional powers. That question, too, is explored by my colleagues, under the familiar Youngstown tripartite analysis. See also Hawai'i v. Trump , 878 F.3d 662, 697-98 (9th Cir. 2017). All of this, to be clear, is entirely appropriate, and I commend the careful and thorough reasoning of the concurring opinions. But this case is permeated from top to bottom by constitutional law, and there is no avoiding it through a statutory disposition.
*352 Second, I believe this is "one of those rare occasions" where we may reverse our usual order of operations because "the constitutional issue is [more] straightforward" than the statutory issues presented. Klingler v. Dir., Dep't of Revenue , 366 F.3d 614, 616 (8th Cir. 2004) (declining to apply canon of constitutional avoidance), vacated on other grounds , 545 U.S. 1111, 1111-12, 125 S.Ct. 2899, 162 L.Ed.2d 291 (2005) ; see also D'Almeida v. Stork Brabant B.V. , 71 F.3d 50, 51 (1st Cir. 1995) (proceeding directly to constitutional question where statutory question is more difficult). The plaintiffs' claims raise statutory questions that are as "difficult and complex," Klingler , 366 F.3d at 616, as they are novel. And in imposing new constraints on the President's authority and discretion under the INA-constraints that will operate against future Presidents under future circumstances as yet unknown-the statutory holding in this case amounts to a broad precedent with wide-ranging and unpredictable consequences.
The majority's constitutional holding, on the other hand, applying the purpose prong of Lemon v. Kurtzman , 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), is cabined to a series of historical facts that is highly unusual and unlikely to recur. As the Supreme Court has observed, it is not often that government action runs afoul of Lemon 's purpose test, "presumably because government does not generally act" with an impermissible motive, and still less with one made manifest. McCreary Cty. v. Am. Civil Liberties Union of Ky. , 545 U.S. 844, 863, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). This case is remarkable because it features just that: a governmental decisionmaker using his own direct communications with the public to broadcast-repeatedly, and throughout the course of this litigation-an anti-Muslim purpose tied specifically to the challenged action. The record of those statements, and their relation to the Proclamation, is canvassed ably by the majority, and by the district court in its thoughtful opinion, and I will not rehash it here. Suffice to say that this is not a case in which we need indulge in "judicial psychoanalysis" of motive. See McCreary , 545 U.S. at 862, 125 S.Ct. 2722. It is all out in the open.
This case is unusual in another respect, too. In the more typical Establishment Clause case, what is at issue is whether some action intended to show respect for religious belief or practice, like a public display of the Ten Commandments, see McCreary , 545 U.S. at 856, 125 S.Ct. 2722, reflects an impermissible religious purpose-a question on which reasonable minds may differ. See id. at 889, 125 S.Ct. 2722 (Scalia, J., dissenting). But this Establishment Clause violation contravenes a different and still more deeply rooted principle: that the government may not act on the basis of animus toward a disfavored religious minority. See Town of Greece v. Galloway , --- U.S. ----, 134 S.Ct. 1811, 1823, 188 L.Ed.2d 835 (2014) (upholding legislative prayer program that does not "denigrate nonbelievers or religious minorities" against Establishment Clause challenge); Lynch v. Donnelly , 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (holding that Establishment Clause "forbids hostility toward any [religion]").
Indeed, the prohibition on government acts based on "religious animosity," Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah , 508 U.S. 520, 535, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), is so central to our constitutional tradition that it finds voice not only in the Establishment Clause but also in the Free Exercise Clause, see id. at 531-40, 113 S.Ct. 2217 (invalidating facially neutral ordinance targeted at practices of disfavored religious minority), and echoes in Equal Protection Clause precedent, as well, see id="p353" href="#p353" data-label="353" data-citation-index="1" class="page-label">*353id. at 540, 113 S.Ct. 2217. Cf. Romer v. Evans , 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (holding that state referendum violates Equal Protection Clause where "the disadvantage imposed is born of animosity toward the class of persons affected"). What is extraordinary about this case is that it involves the rare direct assault on that principle, evidenced by official statements of the President of the United States that graphically disparage the Islamic faith and its practitioners.
As compared to the statutory questions raised by this case, "the appropriate resolution of the constitutional issue" is reasonably clear. See Klingler , 366 F.3d at 616. "[U]pon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." Lukumi , 508 U.S. at 547, 113 S.Ct. 2217. At the same time, I am confident that our Establishment Clause holding will prove to be a precedent of exceedingly limited application. The principle that government decision-making should not be informed by religious animus is so well and deeply understood in this country that there are few violations recorded in the case law. See id. at 523, 113 S.Ct. 2217. Though we must today add one more to the list, we have every reason to expect that future occasions for application of this fact-specific holding will be few and far between.
NIEMEYER, Circuit Judge, with whom Judge AGEE and Senior Judge SHEDD join, dissenting:
This case involves an Article III court's bold effort to second-guess U.S. foreign policy and, in particular, the President's discretionary decisions on immigration, implicating matters of national security. Our constitutional structure forbids such intrusion by the judiciary.
The President, acting on authority granted him by enactments of Congress and by Article II of the Constitution, issued Proclamation No. 9645 on September 24, 2017. The Proclamation imposed restrictions on the entry of aliens from eight countries that, following a comprehensive, global review, were found to have inadequate practices for providing information to U.S. immigration officials and to present a heightened risk of terrorism. The absence of such restrictions, the President determined, "would be detrimental to the interests of the United States."
The district court, looking behind the text of the Proclamation, concluded that the restrictions on entry were likely to be unenforceable because they were motivated by religious animus, in violation of the Establishment Clause of the Constitution, and because they contravened a provision of the Immigration and Nationality Act ("INA") prohibiting nationality-based discrimination in the "issuance of ... immigrant visa[s]." 8 U.S.C. § 1152(a)(1)(A). Accordingly, the court entered a nationwide preliminary injunction prohibiting enforcement of the Proclamation, subject to exceptions. It also "decline[d] to stay [its] ruling."
Following the government's appeal to this court, the government filed a motion for an emergency stay of the injunction pending appeal, but a majority of our court failed to act on the motion. The Supreme Court, however, issued a stay pending review by this court and ultimately by it, by order dated December 4, 2017.[1]
*354 Without any adjustment of position based on the Supreme Court's issuance of the stay, the majority again marches straightway to its desired result. In concluding that the Proclamation violates the Establishment Clause, the majority simply reiterates the reasoning of the district court and its own reasoning from its decision on Executive Order 13,780, dated March 6, 2017, deeming irrelevant the significant differences between that order and the Proclamation, as well as the Supreme Court's vacatur of that decision. Without accepting the Proclamation's stated interest in national security, which the Proclamation explains in detail, the majority concludes that, based on comments made by the President during the presidential campaign and afterwards, the Proclamation cannot be enforced because it is a pretext for religious discrimination. In addition, the separate opinions supporting the majority's judgment construe the applicable INA provisions to have limitations not contained in the statutory text and then hold that the Proclamation violated those limitations.
The opinions of the district court and those supporting the majority's judgment are demonstrably wrong in virtually every material respect. They fail to recognize and address more than a century of jurisprudence explaining the deference federal courts owe to the political branches with respect to decisions to grant or deny foreign nationals entry into this country; they ignore and again fail to address the plain language of the Administrative Procedure Act on which the plaintiffs rely to allege a cause of action that it does not provide; they misconstrue the INA, effectively rewriting it to accord with their own policy choices and then concluding that the President violated the statute as so revised; they apply a novel legal rule that provides for the use of campaign-trail statements to recast later official acts of the President; and they utterly subvert longstanding Supreme Court precedents on the Establishment Clause. For these reasons, as explained herein, I would reverse the district court and vacate its injunction.
I. Statement of the Case
A. Background
On January 27, 2017, the President issued Executive Order 13,769, which restricted the entry of certain foreign nationals into the United States. Shortly thereafter, a district court in Washington State issued an order enjoining nationally the enforcement of several provisions of that order. See Washington v. Trump , No. 17-141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). The Ninth Circuit denied the government's motion to stay that order pending its appeal. See Washington v. Trump , 847 F.3d 1151 (9th Cir. 2017) (per curiam).
Rather than challenge that decision further, the President issued a revised executive order on March 6, 2017, Executive Order 13,780, which directed the Secretary of Homeland Security to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA ... in order to determine that the individual is not a security or public-safety threat." Exec. Order 13,780 § 2(a). In furtherance of that *355 effort, the Executive Order suspended for 90 days the entry of foreign nationals from six countries-Iran, Libya, Somalia, Sudan, Syria, and Yemen-with the stated purpose of reducing the "investigative burdens on relevant agencies" during the pendency of the worldwide review and mitigating the risk that dangerous individuals would be admitted before the government finished implementing "adequate standards ... to prevent infiltration by foreign terrorists." Id. § 2(c); see also id. § 1(d) (explaining that each of the six countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones").
As with the first executive order, Executive Order 13,780 was also promptly enjoined, first by a district court in Hawai'i and then by the district court in this case. See Hawai'i v. Trump , 245 F.Supp.3d 1227 (D. Haw. 2017) ; Int'l Refugee Assistance Project v. Trump , 241 F.Supp.3d 539 (D. Md. 2017). And both injunctions were largely upheld on appeal, although for different reasons. See Hawai'i v. Trump , 859 F.3d 741 (9th Cir. 2017) (per curiam); Int'l Refugee Assistance Project v. Trump , 857 F.3d 554 (4th Cir. 2017) (en banc).
The Supreme Court granted certiorari in both cases and, pending its review, stayed the injunctions as to "foreign nationals who lack any bona fide relationship with a person or entity in the United States." Trump v. Int'l Refugee Assistance Project , --- U.S. ----, 137 S.Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (per curiam). In doing so, the Court reiterated the well-established principle that "[a]n unadmitted and nonresident alien ... ha[s] no constitutional right of entry to this country," id. at 2088 (second alteration in original) (quoting Kleindienst v. Mandel , 408 U.S. 753, 762, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) ), and accordingly concluded that the balance of equities did not warrant broader preliminary relief given the executive branch's "urgent" national security interest in pursuing the order's implementation, id. (quoting Holder v. Humanitarian Law Project , 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) ).
Then, after the 90-day review period provided by Executive Order 13,780 had elapsed, the Supreme Court observed that the Order's suspension of entry had "expired by its own terms" and therefore the case no longer presented a live case or controversy. Trump v. Int'l Refugee Assistance Project , --- U.S. ----, 138 S.Ct. 353, 199 L.Ed.2d 203 (2017). Accordingly, following its "established practice," it vacated our judgment affirming the district court's grant of preliminary injunctive relief and remanded the case "with instructions to dismiss as moot the challenge to Executive Order No. 13,780." Id. (citing United States v. Munsingwear, Inc. , 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950) ). In a separate order issued two weeks later, the Court similarly vacated the Ninth Circuit's judgment upholding the grant of preliminary injunctive relief by the district court in Hawai'i and remanded the case with the same instructions. See Trump v. Hawai'i , --- U.S. ----, 138 S.Ct. 377, 199 L.Ed.2d 275 (2017).
On September 24, 2017, the President issued Proclamation No. 9645, which is at issue in this appeal, entitled, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." The Proclamation recounted how the worldwide review prescribed by Executive Order 13,780 culminated with the submission to the President, on July 9, 2017, of a report from the Department of Homeland Security ("DHS"), which established a "baseline" for the types of information required to determine whether a *356 foreign national should be permitted to enter the United States. Procl. § 1(c). That baseline, which was developed by DHS in consultation with intelligence and foreign-affairs officials from other executive-branch Departments, included three categories of criteria germane to "support[ing] the United States Government's ability to confirm the identity of individuals seeking entry ... and ... assess[ing] whether they are a security or public-safety threat":
(i) Identity-management information .
The United States expects foreign governments to provide the information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be. The identity-management information category focuses on the integrity of documents required for travel to the United States. The criteria assessed in this category include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports.
(ii) National security and public-safety information.
The United States expects foreign governments to provide information about whether persons who seek entry to this country pose national security or public-safety risks. The criteria assessed in this category include whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States.
(iii) National security and public-safety risk assessment.
The national security and public-safety risk assessment category focuses on national security risk indicators. The criteria assessed in this category include whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program established under section 217 of the INA, 8 U.S.C. 1187, that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States.
Id .
The Proclamation then described how DHS had "collected data on the performance of all foreign governments" relative to the baseline, Procl. § 1(d), and evaluated those data to determine that 16 countries were "inadequate" with respect to their identity-management protocols, information-sharing practices, and security-risk factors and that another 31 countries were "at risk" of becoming inadequate, id . § 1(e). It also explained how the State Department thereafter followed up on DHS's evaluation by "conduct[ing] a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either 'inadequate' or 'at risk,' to improve their performance with respect to the baseline." Id . § 1(f). As a result of that engagement, many foreign governments improved their performance significantly. For example, 29 provided DHS with exemplars of their travel documents, and 11 agreed to share information on known or suspected terrorists. Id.
As the Proclamation noted, following the engagement period, DHS concluded that the governments of Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen *357 remained "inadequate" so as to warrant restrictions on the ability of their nationals to enter the United States. Procl. § 1(g). Iraq was likewise deemed "inadequate," but DHS concluded that entry restrictions with respect to Iraqi nationals were not warranted because, among other reasons, of the Iraqi government's "close cooperative relationship" with the United States and the significant presence of American military forces there. Id . DHS recommended instead that Iraqi nationals seeking entry be subject to "additional scrutiny." Id. Separately, DHS determined that although the government of Somalia "generally satisfie[d] the information-sharing requirements of the baseline," its inability to cooperate with the United States in certain respects and the terrorist threats within its territory "present[ed] special circumstances" justifying the imposition of entry restrictions on its nationals. Id. § 1(i). DHS thus submitted another formal report to the President on September 15, 2017, which recommended that he limit the entry into the United States of foreign nationals from eight countries-Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia. See id. §§ 1(h)-(i).
The Proclamation stated that the President evaluated DHS's recommendations with the aid of various members of his Cabinet and White House staff, including the Secretary of State, the Secretary of Defense, and the Attorney General, see Procl. § 1(h), and ultimately decided to impose certain restrictions on the entry of individuals from the eight countries, see id. § 1(h)-(i). In doing so, the President expressly invoked "the authority vested in [him] by the Constitution and the laws of the United States of America," including 8 U.S.C. §§ 1182(f) and 1185(a).[2] Id . Preamble. The Proclamation stated that, in the President's judgment, the restrictions were necessary to "prevent the entry of those foreign nationals about whom the [Government] lacks sufficient information"; to "elicit improved identity-management and information-sharing protocols and practices from foreign governments"; and to otherwise "advance [the] foreign policy, national security, and counterterrorism objectives" of the Nation. Id. § 1(h)(i).
The restrictions, as set forth in Section 2 of the Proclamation, vary by country based on the findings made as to that country. Three countries-Iran, North Korea, and Syria-were found inadequate under the DHS baseline, and the entry of all of their nationals, either as immigrants or nonimmigrants, was suspended. See Procl. § 2(b)(ii), (d)(ii), (e)(ii).[3] Three other countries-Chad, Libya, and Yemen-were found to be inadequate with respect to the DHS baseline but were nonetheless considered to be "valuable counterterrorism partner[s]," and therefore the Proclamation *358 suspended only "[t]he entry into the United States of [their] nationals ... as immigrants, and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas." Id . § 2(a)(ii), (c)(ii), (g)(ii). Because Somalia generally satisfied the requirements of the DHS baseline but was found to have identity-management deficiencies and to be a terrorist safe haven, see id . § 2(h)(i), the Proclamation suspended immigrant entry for its nationals and provided for "additional scrutiny" of those seeking to enter as nonimmigrants, id. § 2(h)(ii). Finally, for Venezuela, the Proclamation adopted more "focus[ed]" entry restrictions-i.e. , suspending the entry of certain government officials (and their family members) on nonimmigrant business and tourist visas-that respond to the country's refusal to fully cooperate on immigration issues while accounting for the fact that the United States is nevertheless capable of independently verifying the identity of Venezuelan entrants through other sources. Id. § 2(f).
The Proclamation's restrictions were made applicable only to foreign nationals of the eight countries who were outside the United States and who did not have a valid visa or comparable travel document. See Procl. § 3(a); see also id . § 3(b) (enumerating exceptions to the Proclamation's entry restrictions). Moreover, the restrictions were made waivable by U.S. immigration officials in cases where an affected foreign national demonstrates that denying him entry would cause him undue hardship, that his entry would not pose a threat to national security or public safety, and that his entry would be in the national interest. See id . § 3(c); see also id. § 3(c)(iv) (listing examples of when a waiver might be appropriate, such as if the foreign national "has previously established significant contacts with the United States" or "seeks to enter ... to visit or reside with a close family member").
Finally, the Proclamation required the Secretary of Homeland Security, in consultation with other Cabinet officers, to assess the circumstances of the eight countries on a regular basis (every 180 days), taking into account any change in their performance relative to the DHS baseline, and to recommend whether the restrictions should be modified or continued. See Procl. § 4.
B. Proceedings
Shortly after the Proclamation issued and before the effective date of many of its provisions, 23 individuals and 7 organizations challenged it in three civil actions (later consolidated), seeking injunctive relief, including preliminary injunctive relief. They named as defendants President Trump, several Cabinet officers and other high-ranking officials, DHS, the Department of State, and the Office of the Director of National Intelligence.
The individual plaintiffs are U.S. citizens and lawful permanent residents who have one or more relatives who are nationals of one of the eight countries subject to the Proclamation's entry restrictions. These plaintiffs seek to have their relatives, who are currently abroad, enter the country on a U.S. visa. Although they and their relatives are at varying stages in the visa issuance process, many have not received a valid immigrant or nonimmigrant visa.[4]
*359 Four of the organizational plaintiffs-the Middle East Studies Association of North America ("MESA"), the Yemeni-American Merchants Association ("YAMA"), Iranian Alliances Across Borders ("IAAB"), and the Iranian Students' Foundation ("ISF")-primarily organize events for their constituencies or otherwise advocate on their behalf. MESA represents more than 2,400 students and faculty around the world who focus on Middle Eastern studies; YAMA protects its members from harassment and assists them with immigration issues; IAAB organizes youth camps and conferences for individuals who are part of the Iranian diaspora; and ISF, an affiliate of IAAB, convenes events for approximately 30 Iranian-American students at the University of Maryland. The three remaining organizational plaintiffs-the International Refugee Assistance Project ("IRAP"), HIAS, Inc., and the Arab-American Association of New York ("AAANY")-primarily provide legal services to clients. IRAP provides legal services to displaced persons; HIAS serves refugees by, among other things, assisting them with resettlement; and AAANY provides legal and other services to the Arab-American and Arab immigrant community in New York City.
The district court, on the request of the plaintiffs, ordered expedited briefing and argument on the plaintiffs' motion for a preliminary injunction, and on October 17, 2017, the court granted the plaintiffs' motion in substantial part, entering a nationwide preliminary injunction based upon a 91-page opinion. The court, concluding that the plaintiffs were likely to succeed in showing that the Proclamation violated the INA and the Establishment Clause, enjoined enforcement of the Proclamation's entry restrictions as to foreign nationals-except those from North Korea and Venezuela-who have "a credible claim of a bona fide relationship with a person or entity in the United States."
In its opinion, the district court rejected the government's arguments that the plaintiffs lacked standing to sue and that a decision of the political branches to exclude aliens is generally not subject to judicial review. Regarding the latter point, the court explained that because the plaintiffs had not challenged "individual visa decisions by consular officers, but the overarching travel ban policy imposed by the Proclamation," the rule of nonreviewability did not apply. Accordingly, it proceeded to address the merits of the plaintiffs' claims.
As to the INA, the court determined that, while the plaintiffs had failed to show that the Proclamation exceeded the scope of authority granted by 8 U.S.C. § 1182(f), which empowers the President to suspend the "entry" of aliens "as immigrants or nonimmigrants" for "such period[s] as he shall deem necessary," they nonetheless showed that they were likely to succeed on their claim that the Proclamation violated the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas, see 8 U.S.C. § 1152(a)(1)(A). The court acknowledged that denying entry to aliens based on their nationality might be permissible in certain circumstances, "such as during a specific urgent national crisis or public health emergency," but it concluded that, because the Proclamation's entry restrictions were "effectively ... permanent," they were "the equivalent of a ban on issuing immigrant visas based on *360 nationality" and thus violated § 1152(a)(1)(A).
As to the plaintiffs' Establishment Clause claims, the district court agreed that its analysis was controlled by Kleindienst v. Mandel , 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), which held that courts are precluded from "look[ing] behind" the Government's "facially legitimate and bona fide reason" for exercising its authority to exclude aliens and directed that judges not balance the justification for such an exercise with its impact on individuals' constitutional rights. While the district court acknowledged that the Proclamation had at least one facially legitimate purpose-"to protect the security and interests of the United States and its people"-it held that the plaintiffs had made a "particularized showing of bad faith" on the part of the President and thus it was entitled to "look behind" the Proclamation's stated rationale and conduct a "traditional constitutional analysis" of the plaintiffs' claims under the Establishment Clause. To conduct this analysis, the court relied principally on the President's statements from campaign rallies and on Twitter, concluding that the Proclamation stood in the "shadow" of the Administration's two previous executive orders, which had been held by it and other lower courts as likely violating the Establishment Clause, and that nothing in the Proclamation or the interagency process leading up to its promulgation had sufficiently "cured" the "taint" of those earlier orders. At bottom, the court found that the plaintiffs were likely to show that the primary purpose of the Proclamation was to express "animus" towards Muslims and that therefore it likely violated the Establishment Clause.
From the district court's entry of the preliminary injunction, the government filed this appeal. The plaintiffs cross-appealed, contending that the district court's injunction should not have excluded from its scope "individuals lacking a credible claim of a bona fide relationship with a person or entity in the United States."
II. Threshold Barriers
A. Separation of Powers
The Supreme Court has long recognized a constitutionally grounded division of authority among the departments of government such that matters of foreign policy and, in particular, immigration policy as to aliens abroad are committed exclusively to the political branches as aspects of national sovereignty. See, e.g. , Fiallo v. Bell , 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). As an exercise of sovereign power that stands apart from acts under domestic laws, the exclusion of aliens is thus "largely immune from judicial control." Id . (quoting Shaughnessy v. United States ex rel. Mezei , 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953) ). Indeed, the Supreme Court has explained:
The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.
Thus, the decision to admit or exclude an alien may be lawfully placed with the President, who may delegate the carrying out of this function to a responsible executive officer.... The action of the executive officer under such authority is final and conclusive .
United States ex rel. Knauff v. Shaughnessy , 338 U.S. 537, 542-43, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (emphasis added) (citations omitted). Thus, although the Constitution allocates the power to exclude aliens *361 to both political branches, Congress may "lawfully place[ ]" essentially all of its share in the hands of the President, enabling him to aggregate their respective powers in this regard and put them to use "for the best interests of the country." Id . at 543, 70 S.Ct. 309. Accordingly, an executive officer invoking such statutory authority may exclude aliens who have never before crossed "the threshold of initial entry," and his decision on the matter is essentially unreviewable. Mezei , 345 U.S. at 212, 73 S.Ct. 625 ; see also Knauff , 338 U.S. at 543, 70 S.Ct. 309 (explaining that "it is not within the province of any court, unless expressly authorized by law, to review th[at] determination").
For over 100 years, the Supreme Court has unwaveringly adhered to this position. See, e.g ., Chae Chan Ping v. United States , 130 U.S. 581, 609, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) ("The power of exclusion of foreigners [is] an incident of sovereignty belonging to the [federal] government ... as part of those sovereign powers delegated by the [C]onstitution [such that] ... its exercise ... when, in the judgment of the government, the interests of the country require it, cannot be ... restrained on behalf of any one"); Nishimura Ekiu v. United States , 142 U.S. 651, 659, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) ("[E]very sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners ... or to admit them only in such cases and upon such conditions as it may see fit to prescribe. In the United States this power is vested in the national government, to which the [C]onstitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government ") (emphasis added) (citations omitted); Fong Yue Ting v. United States , 149 U.S. 698, 731, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) ("The question whether, and upon what conditions, these aliens shall be permitted to remain within the United States being one to be determined by the political departments of the government, the judicial department cannot properly express an opinion upon ... the measures enacted by [C]ongress in the exercise of [its] powers ... over this subject") (emphasis added); see also Mandel , 408 U.S. at 765-66, 92 S.Ct. 2576 (noting that the "Court's general reaffirmations of this principle have been legion").
Thus, beginning with its earliest immigration decisions, the Court established a principle that "leav[es] essentially no room for judicial intervention in immigration matters." Castro v. U.S. Dep't of Homeland Security , 835 F.3d 422, 441 (3d Cir. 2016). And although this principle has subsequently been limited in some respects-most importantly as to foreign nationals who have already entered the United States or otherwise obtained a legal status recognized by its immigration laws-the Court has continued to hold that judicial nonreviewability applies to aliens who have never crossed the "threshold of initial entry." Id . at 443 (quoting Mezei , 345 U.S. at 212, 73 S.Ct. 625 ); see also Richard H. Fallon, Jr. & Daniel J. Meltzer, Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror , 120 HARV. L. REV. 2029, 2082 n.209 (2007) (explaining that the Supreme Court has "barely retreated" from the nonreviewability principle with respect to "aliens excluded from entry").
To be sure, the Court has infrequently engaged in narrow judicial inquiries into government decisions to exclude foreign nationals when plaintiffs with ties to the United States have asserted violations of their individual constitutional rights. But even in the few instances where it has done so, the Court has upheld the political branches' essentially exclusive exercise of authority in this area, reaffirming the core *362 principle of nonreviewability as to aliens abroad. See Mandel , 408 U.S. at 765, 92 S.Ct. 2576 (citing Chae Chan Ping , 130 U.S. at 581, 9 S.Ct. 623 ); Fiallo , 430 U.S. at 792, 97 S.Ct. 1473 (same); Kerry v. Din , --- U.S. ----, 135 S.Ct. 2128, 2141, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring) (limited judicial review was compelled by the "political branches' broad power over the ... administration of the immigration system"); cf . Sale v. Haitian Ctrs. Council, Inc. , 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (not addressing justiciability but nonetheless upholding the President's authority under 8 U.S.C. § 1182(f) to exclude Haitians interdicted in international waters).
Simply stated, the plaintiffs cannot obtain judicial review of their claims, given the Supreme Court's longstanding immigration jurisprudence, which prohibits courts from playing any role in reviewing the political branches' decisions to deny entry to aliens abroad-unless the political branches have themselves provided for such a judicial role in the clearest terms, see Mezei , 345 U.S. at 212, 73 S.Ct. 625 ; Castro , 835 F.3d at 442-44, or unless the circumstances of their claim fit the narrow slot left open by Mandel and its progeny.
The district court failed to acknowledge the scope of the structural limitation on its role with respect to immigration matters-recognizing only a doctrine of nonreviewability with respect to individual visa decisions by consular officers. But it nonetheless purported to rely on Mandel to justify its entry into the prohibited field. In doing so, however, it misconstrued and reconstructed the holding of that case.
The Mandel Court held that "when the Executive exercises ... power [delegated by Congress to exclude aliens abroad] negatively on the basis of a facially legitimate and bona fide reason , the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests " of U.S. citizens. 408 U.S. at 770, 92 S.Ct. 2576 (emphasis added). Yet, the district court, instead of restricting itself to a facial review of the Proclamation, lifted and isolated the term "bona fide" from the Mandel standard to justify its looking behind the Proclamation and then proceeded to consider oral statements made by the President during his campaign for office and thereafter. In doing so, the district court violated Mandel and the nonreviewability principle, as reiterated in that case.
In Mandel , Ernest Mandel, a Belgian citizen, was denied a nonimmigrant visa to enter the United States to participate in conferences and to give speeches. In denying his admission to the United States, the Attorney General relied on 8 U.S.C. §§ 1182(a)(28)(D), 1182(a)(28)(G)(v), and 1182(d)(3)(A), which then provided that aliens who advocate or publish "the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship" must be excluded unless granted a waiver by the Attorney General. Mandel admitted that he was a Marxist who advocated the economic, governmental, and international doctrines of world communism, and the Attorney General refused to grant him a waiver, reciting as grounds that Mandel had violated the conditions of a prior waiver. Mandel , 408 U.S. at 756, 758-59, 92 S.Ct. 2576. University professors in the United States, who had invited Mandel to the United States to speak, as well as Mandel himself, filed an action challenging the constitutionality of the relevant statutory provisions and the Attorney General's exercise of his authority under those provisions. Id . at 759-60, 92 S.Ct. 2576. They alleged that the relevant statutory provisions and the Attorney General's *363 denial of a waiver were unconstitutional because they deprived the American plaintiffs of their First Amendment rights to hear and meet with Mandel. Id . at 760, 92 S.Ct. 2576.
Despite the Court's recognition of the professors' First Amendment rights and the fact that Mandel's exclusion implicated those rights, see Mandel , 408 U.S. at 762-65, 92 S.Ct. 2576, the Supreme Court held that Mandel's exclusion was lawful, see id . at 769-70, 92 S.Ct. 2576. The Court explained that, based on "ancient principles of the international law of nation-states," Congress could categorically bar those who advocated Communism from entry, noting that "the power to exclude aliens is 'inherent in sovereignty , necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers-a power to be exercised exclusively by the political branches of government .' " Id . at 765, 92 S.Ct. 2576 (emphasis added) (citations omitted). As support for this proposition, the Court repeated Justice Harlan's holding that Congress's power "to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, [was] settled by [the Court's] previous adjudications." Id . at 766, 92 S.Ct. 2576 (quoting Lem Moon Sing v. United States , 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895) ).
Then the Mandel Court, setting aside the question of whether the Attorney General's denial of a waiver violated the First Amendment, forbade judges from interfering with the Executive's "facially legitimate and bona fide" exercise of its immigration authority. 408 U.S. at 770, 92 S.Ct. 2576. Specifically, it recognized that "Congress has delegated conditional exercise of this power [of exclusion] to the Executive" and concluded:
We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.
Id .
Since deciding Mandel , the Court has consistently reaffirmed and applied its holding. In Fiallo , the Court declined to scrutinize a statute that gave different immigration status to a child born out of wedlock depending on whether it was the child's mother or father who was a citizen or lawful permanent resident. Although that statute involved two suspect classifications-gender and legitimacy-the Court, citing Mandel , nonetheless concluded that "it is not the judicial role in cases of this sort to probe and test the justifications" of immigration policies. Id . at 799, 97 S.Ct. 1473. Accordingly, in response to the plaintiffs' argument that the distinction was "based on an overbroad and outdated stereotype," the Court indicated that "this argument should be addressed to the Congress rather than the courts." Id . at 799 n.9, 97 S.Ct. 1473.
And these principles were reiterated more recently in Justice Kennedy's concurring opinion in Din . There, the Court considered a suit by a U.S. citizen who alleged that the government violated the Due Process Clause by denying her husband's visa application without adequate explanation, providing only a citation to the statutory provision under which the visa was denied. Justice Kennedy, writing for himself and Justice Alito to provide the fourth and fifth votes in favor of the government, *364 stated that "[t]he reasoning and the holding in Mandel control here" and that Mandel 's reasoning "has particular force in the area of national security." Din , 135 S.Ct. at 2140 (Kennedy, J., concurring in the judgment). He concluded that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that, because the government had provided Din with a facially legitimate and bona fide reason for its action, Din had no viable constitutional claim. Id . at 2141.
The holding of Mandel ineluctably requires that we reject the district court's construct of it. Here, as in Mandel , Congress delegated broad power to the executive branch to regulate the entry of foreign nationals. Compare 8 U.S.C. §§ 1182(a)(28)(D)and 1182 (d)(3)(A) (1970)with 8 U.S.C. § 1182(f). The plaintiffs in each case challenged the Executive's exercise of that discretion, claiming violations of their individual First Amendment rights. Thus, just as the Court in Mandel rejected the plaintiffs' challenge because, even assuming a constitutional violation lurked beneath the surface of the Executive's implementation of its statutory authority, the reasons the Executive had provided were "facially legitimate and bona fide," so must we reject this similar challenge today.
The plaintiffs provide no coherent basis for their assertion that their claims can escape the force of Mandel . They do argue that Mandel 's holding does not apply to claims under the Establishment Clause, but they are unable to point to any case in which the Supreme Court has ever suggested the existence of such a limitation. Indeed, Mandel expressly stated that legitimate First Amendment claims could not override the political branches' authority to exclude aliens, and, of course, the Establishment Clause is a component of the First Amendment. Absent any case supporting plaintiffs' position, we are not now at liberty-nor was the district court-to craft out of whole cloth exceptions to controlling Supreme Court precedents.
Not to be deterred, the district court reconstructed Mandel 's clear holding, asserting that "if there is a particularized showing of bad faith, a court should then 'look behind' the action to evaluate its justification." Thus, rather than determining from the face of the Proclamation whether the reasons given for the entry restrictions were legitimate and bona fide, which would preclude a "look behind" it for extrinsic evidence of bad faith, the court looked behind it first to conclude that the Proclamation was not bona fide. With this twist of Mandel , the court then reviewed candidate Trump's campaign statements, as well as his later statements and tweets, and concluded that the primary purpose of Executive Order 13,780 and Proclamation 9645 was "to effect the equivalent of a Muslim ban," justifying the plaintiffs' allegation that the "Proclamation is not bona fide." The court stated that even though the Proclamation is on its face legitimate and provides reasons rooted in national security, because the plaintiffs have "plausibly alleged" bad faith, it was no longer bound to defer to the Proclamation's stated purpose. It thus casually dismissed the controlling principles of Mandel and its progeny. And the majority opinion adopts the district court's approach in full.
If the district court's understanding, as well as the majority's, were shared by the Supreme Court, the results in Mandel , Fiallo , and Din would have been different, because in each of those cases, the plaintiffs alleged bad faith with at least as much particularity as do the plaintiffs here. In Mandel , the allegations were such that Justice Marshall, writing in dissent, observed *365 that "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver in this case would reveal that it is a sham." 408 U.S. at 778, 92 S.Ct. 2576 (Marshall, J., dissenting). In Fiallo , Justice Marshall, again writing in dissent, pointed to the fact that the statute in question relied on "invidious classifications." 430 U.S. at 810, 97 S.Ct. 1473 (Marshall, J., dissenting). And in Din , the plaintiffs argued that the consular decision should be reviewed because it fell within the "limited circumstances where the government provides no reason, or where the reason on its face is illegitimate." Brief for Respondent at 31, Din , 135 S.Ct. 2128 (No. 13-1402), 2015 WL 179409. But, as those cases hold, a lack of good faith must appear on the face of the government's action, not from looking behind it .
In sum, the district court failed to address, indeed even to recognize, the limited role of courts in reviewing the discretionary actions of the Executive in matters of immigration, and no further analysis should now be necessary for reversing its injunction. And the opinions supporting the majority's judgment do the same, even to a greater extent, blurring the role of the Executive in the context of foreign policy and its role in executing domestic law. Ignoring these realities of our constitutional structure, these opinions elevate the judgment of Article III courts over that of the President, violating deeply seated separation of powers principles.
B. Administrative Procedure Act
Perhaps recognizing the principle that judicial review of decisions to exclude aliens abroad is generally unavailable unless Congress expressly and clearly provides otherwise, see Mezei , 345 U.S. at 212, 73 S.Ct. 625, the plaintiffs claim statutory authority for presenting their claims in federal court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq . And the district court affirmed the plaintiffs' approach with an adventuresome application of that Act paralleling its erroneous application of Mandel .
While the APA provides judicial review of "agency action" generally, 5 U.S.C. § 704 ; see also id. §§ 702, 706, it does not apply where "statutes preclude judicial review," 5 U.S.C. § 701(a)(1) ; or where the agency action sought to be reviewed "is committed to agency discretion by law," id . § 701(a)(2) ; or where "other limitations on judicial review" exist, id . § 702(1); see also Saavedra Bruno v. Albright , 197 F.3d 1153, 1157-58 (D.C. Cir. 1999). These limitations are plainly applicable to bar the plaintiffs' invocation of the APA here.
First , the INA does not provide the plaintiffs with any cause of action; rather, its amendments evince congressional intent to preclude review for the claims they seek to assert. In 1961, after the Supreme Court had held that an alien who was physically present in the United States could, under the APA, bring a declaratory judgment action to obtain a declaration that he was not excludable, see Brownell v. We Shung , 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956), Congress responded by amending the INA to make clear that the only method for judicial review of exclusion orders was through a habeas corpus proceeding, which is generally unavailable to aliens outside the country. See Saavedra Bruno , 197 F.3d at 1161 (citing Pub. L. No. 87-301, § 5(b), 75 Stat. 651 (1961) ); see also id . (describing Congress's position at the time that "[t]o allow APA review would 'give recognition to a fallacious doctrine that an alien has a "right" to enter this country which he may litigate in courts of the United States' " (quoting H.R. Rep. No. 87-1086, at 33 (1961) ) ). Because Congress, in the INA, so foreclosed judicial review of exclusion orders, except *366 through habeas, as to aliens within the United States, it follows that it similarly foreclosed judicial review of exclusion orders as to aliens abroad . Moreover, Congress has never created any private right of action in the INA providing for judicial review of decisions made pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1), on which the Proclamation relied, or enacted any provision indicating that such decisions are reviewable under the APA.
Second , the Proclamation is not an "agency action" that is subject to review under the APA. 5 U.S.C. § 704 (authorizing review of "[a ]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court") (emphasis added). It is clear that the President is not an agency for purposes of the APA, and accordingly his Proclamation cannot be agency action. See Franklin v. Massachusetts , 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). In Franklin , the Court stated:
[W]e find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion. As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.
Id . at 800-01 (citation omitted). The district court agreed that the government's argument on this point "ha[d] merit." It concluded, however, that the officials and federal agencies named as defendants apart from the President were within the scope of the APA, and, because they were charged with implementing the Proclamation, they could be the subject of an APA action challenging the Proclamation. This assertion, however, was dubious because it is ultimately not the Proclamation's enforcement against aliens that has been challenged, but rather its authority and issuance, which are attributable to the President alone.
Third , the APA precludes review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Proclamation 9645 was issued under the authority of 8 U.S.C. §§ 1182(f) and 1185(a)(1), and only a cursory review of those provisions confirms that they accord the Executive broad discretion to exclude aliens.[5]
Fourth , and most importantly, the APA explicitly preserves existing doctrines sounding in judicial restraint-including the principle of nonreviewability described previously-by providing that "[n]othing herein ... affects other limitations on judicial review or the power or duty of the court to ... deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702(1). As the court in Saavedra Bruno explained, § 702(1) 's recognition of "other limitations" on the scope of APA review reflects Congress's intent to maintain longstanding prudential limits confining the judiciary to its proper role in our constitutional system, such as the political question doctrine and related areas of the "law of unreviewability." 197 F.3d at 1158 *367 (citation omitted). And at the time Congress enacted § 702(1), the Supreme Court had for 70 years adhered to its position that the exclusion of aliens abroad is a fundamental act of sovereignty committed to the political branches. Thus, rather than abrogating that position, the APA affirmatively adopted it as an internal limitation on the scope of review of agency action.
The district court attempted to bypass this unreviewability doctrine by limiting it to "individual visa decisions by consular officers," as opposed to a "broader policy on alien entry," like the one applied in the Proclamation. But in doing so, as noted above, the court failed to recognize that the nonreviewability of visa determinations by consular officers stems from the antecedent principle articulated time and again in the Supreme Court's immigration cases: that determining who may enter the Nation's borders-and who may not-bears directly on our national sovereignty, is an inherently political judgment, and has accordingly been entrusted by the Constitution to the political branches. Moreover, the effect of the district court's conclusion would be untenable. A court would accord absolute deference to decisions of consular officers-subordinate officials who implement executive and legislative authorities, but are far removed from their source-while permitting judges to interfere with the decisions of Congress and the President regarding the same subject. This would upend the settled understanding of the separation of powers, and with it over 100 years of Supreme Court jurisprudence.
III. INA Claims
On the merits, the plaintiffs contend that the Proclamation exceeds the scope of authority granted by §§ 1182(f) and 1185(a) or otherwise violates them. They also contend that the Proclamation's restrictions on the entry of nationals from eight countries violates 8 U.S.C. § 1152(a)(1)(A), which prohibits discrimination because of, among other things, nationality in the issuance of immigrant visas . They argue that the Proclamation effectively eviscerates § 1152(a)(1)(A) 's prohibition against discrimination by using the authority conferred by §§ 1182(f) and 1185(a)(1) to bar the entry of aliens using the visa system, based on their nationality. According to the plaintiffs, the Proclamation thus "overrides congressional judgments" imbedded in the INA, especially regarding visa issuance. In a similar vein, they contend that § 1152(a)(1)(A) constricts the authority granted under § 1182(f) and that, to the extent that the two provisions conflict, § 1152(a)(1)(A) controls, as they maintain, because it was the later and more specific enactment.
Explaining the repeated use by past Presidents of §§ 1182(f) and 1185(a) to ban a particular country's nationals from entry into the United States, whether possessing visas or not-for example, President Carter's orders authorizing the imposition of entry restrictions on Iranian nationals, Exec. Order No. 12,172, 44 Fed. Reg. 67947 (Nov. 26, 1979) ; Exec. Order No. 12,206, 45 Fed. Reg. 24101 (Apr. 7, 1980), and President Reagan's 1985 Proclamation suspending the entry of Cuban nationals as immigrants, Procl. No. 5377, 50 Fed. Reg. 41329 (Oct. 4, 1985) -the plaintiffs maintain in their briefing that such uses were justified because they "addressed acute foreign policy crises that Congress had not already addressed." At oral argument, however, the plaintiffs remarkably contended that these acts of prior Presidents had violated the INA. Oral Argument at 1:34:53 ("I don't think any nationality bans are valid"); id . at 1:35:42 ("There's a way to read [the Reagan and Carter orders as] in harmony [with § 1152(a)(1)(A) ], [but] I actually do believe *368 that § 1152(a)... prohibits nationality discrimination").
The district court concluded that the plaintiffs were likely to succeed on their claim that the Proclamation violated § 1152(a)(1)(A), construing that provision as a limitation on the President's power to suspend alien entry, but that they would not likely succeed on their claims based on § 1182(f), even though it concluded that § 1152(a)(1)(A) constricts the President's authority under § 1182(f). The court stated that it would be "meaningless" for a foreign national to receive a visa only to subsequently be deemed inadmissible and noted further that the entry of immigrants and the issuance of visas "usually go hand-in-hand." The court also found it problematic that the Proclamation had no "specified end date and no requirement of renewal," asserting that nationality-based denials of entry of "limited duration" would be less likely to discriminate in violation of § 1152(a)(1)(A). The court acknowledged, however, that a President could "arguably" deny the entry of all nationals from a particular country under § 1182(f) -even with the effect of precluding immigrant visas based on nationality-if the authority is exercised "during a specific urgent national crisis or public health emergency." It gave as an example President Reagan's 1986 decision to bar the entry of Cuban nationals.
The government contends that the district court erred in reading § 1152(a)(1)(A) to override the President's distinct authority under §§ 1182(f) and 1185(a)(1), "especially in light of the statutory deference afforded to the President, contrary historical practice, and serious constitutional concerns raised by that interpretation." It argues that, as a matter of statutory construction, the two provisions can be read to function harmoniously when one recognizes that § 1182(f) authorizes barring the entry of aliens based on nationality, whereas § 1152(a)(1)(A) bars nationality discrimination in the issuance of immigrant visas -two distinct concepts. It points out that, under the structure of the INA, even persons having visas can still be barred from entry into the United States, as all entering aliens must satisfy the requirements both for a visa and for entry. Moreover, it notes that in enacting § 1152(a)(1)(A), Congress intended to eliminate the country-quota system as to those aliens otherwise eligible for visas, "not to modify the eligibility criteria for admission or to limit pre-existing provisions ... addressing entry," such as § 1182(f). Opening Brief at 36 (citing H.R. Rep. No. 89-745, at 12 (1965) ("Under this [new] system, selection from among those eligible to be immigrants ... will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry") (emphasis added) and S. Rep. No. 89-748, at 13 (1965) (similar) ). Finally, the government points to the use of §§ 1182(f) and 1185(a)(1) by past Presidents to exclude nationals from particular countries, such as President Carter's 1979 and 1980 Executive Orders restricting Iranians and President Reagan's 1985 Proclamation barring Cubans, among others.
I conclude, as to the plaintiffs' § 1152(a)(1)(A) claim, that the district court's interpretation of the INA should be rejected as it creates conflict between §§ 1152(a)(1)(A) and 1182(f) when none had previously existed. A more complete reading of the INA demonstrates that the two provisions can be construed to give full effect to both without conflict.
Under the INA, to obtain admission to the United States, a foreign national must normally possess a valid immigrant or nonimmigrant visa. See 8 U.S.C. §§ 1181, *369 1182(a)(7), 1203. Procuring either type of visa typically entails an in-person interview and requires a favorable determination by consular officers from the Department of State. See id . §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. § 42.62. But holding a valid visa does not guarantee a right of entry into this country. Rather, the INA requires that a visa holder traveling to the United States must also be deemed admissible upon arriving at a port of entry. It provides:
Nothing in this chapter shall be construed to entitle any alien, to whom a visa ... has been issued , to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law. The substance of this subsection shall appear upon every visa application.
8 U.S.C. § 1201(h) (emphasis added). Thus delineating the concepts of admissibility and visa issuance , the INA provides discrete application and criteria for each. Every alien must be admissible to come lawfully within the borders of the United States, and admissibility is a requirement independent of the requirements for obtaining a visa. Moreover, any restriction on admissibility applies to all immigrants and nonimmigrants, whereas the requirements for obtaining a visa must be satisfied through the process specific to applying for either an immigrant or a nonimmigrant visa. By its plain terms, § 1152(a)(1)(A) applies solely to immigrant visa issuance , and it does not include the word "entry" or "admissibility." Conversely, § 1182(f) gives the President authority to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants ." (Emphasis added). As a consequence, if an alien is not admissible under § 1182 -including § 1182(f) by reason of a President's proclamation-the provisions on obtaining a visa, including § 1152(a), never come into play. To read the restrictions in § 1152(a)(1)(A) as constraining the authority conferred on the President by § 1182(f) would fail to recognize the separate and distinct roles of the two provisions, with the effect that the President would be prohibited from suspending entry of a specified class of aliens-i.e. , those from a particular country -contrary to the clear text of § 1182(f). Such an approach would ignore an elementary principle of statutory construction: "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." Radzanower v. Touche Ross & Co. , 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) (quoting Morton v. Mancari , 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) ).
In reaching its conclusions, the district court erroneously collapsed the concept of entry with the concept of visa issuance , linking the two such that it could not thereafter read § 1152(a)(1)(A) and § 1182(f) harmoniously. The opinions in support of the majority's judgment do the same. For instance, Chief Judge Gregory concludes that § 1152(a)(1)(A)"controls and limits whatever authority the President has under § 1182(f)" and therefore that the Proclamation violates § 1152(a)(1)(A) because it "operates by categorically denying the issuance of visas ." Ante at 304 (emphasis added). Judge Keenan states similarly, construing the provisions as being "intertwined" such that they are in tension with one another and then concluding that § 1152(a)(1)(A)"governs" as it is "the later-enacted and more specific provision." Ante at 318.
Moreover, to rationalize its desired result, the district court, as well as the opinions supporting the majority's judgment, had to construe the text of § 1182(f) in a manner that contorted its unambiguous *370 language. For instance, the district court concluded that the language of § 1182(f) requires that the President impose a "specified end date," a conclusion that Judge Keenan also reaches. See ante at 313. Yet, the statutory language does not support such a construction; it provides that the Proclamation may be issued "for such period as [the President] shall deem necessary." 8 U.S.C. § 1182(f). In this case, the Proclamation defines that "period" unambiguously, linking the duration of the restrictions on the eight countries to their governments' satisfaction of the conditions found and requiring that a review be conducted of those conditions every 180 days, with the clear inference that should they satisfy the conditions, the restrictions would be lifted. That is the "period" that the President "deem[ed] necessary." If the President were to impose a bar of nationals from a country in a state of war with the United States, the "period" implied would be until that state of war ended, which hardly could allow for a "specified end date," as required by the district court's and Judge Keenan's construction.
The district court also found it necessary to create an exception to its interpretation that § 1152(a)(1)(A) constricts the authority conferred by § 1182(f) in order to accommodate the conceded reality that the President has the power to exclude aliens based on nationality "during a specific urgent national crisis or public health emergency." Recognizing as legitimate the repeated exercise of that authority by past Presidents, the court attempted to harmonize its construction that § 1152(a)(1)(A) constricts § 1182(f) by adding the "crisis" exception. Chief Judge Gregory does the same. See ante at 305 (suggesting the possibility of "a narrow exception to § 1152(a)(1) that allows national bans under extraordinary circumstances"); ante at 296 (acknowledging in his interpretation of § 1182(f) the President's authority to exclude nationals during an "exigency"). Alternatively, however, he seeks to distinguish the prior proclamations and executive orders that excluded nationals of particular countries. See ante at 304-05. These efforts amount to a clumsy attempt to avoid the plain statutory language that authorized those orders.
On a larger scale, neither the plaintiffs nor the opinions supporting the majority's judgment seriously address the overriding constitutional problem raised by their construction of §§ 1152(a)(1)(A) and 1182(f). As a clear example, if the United States were to enter into a state of war with a foreign nation or were attacked by foreigners, their preferred construction would wreak havoc by precluding entry restrictions that would be necessary in such a time of crisis. Their interpretation ignores the constitutional separation-of-powers problem raised by this simple example and thus unwittingly highlights the deference that courts must give to the political branches in foreign relations and immigration matters.
In a further effort to rationalize their desired outcome, the opinions supporting the majority's judgment also interpose new requirements and limitations into § 1182(f) itself, leading to their conclusion that the President violated the new requirements and limitations. This mode of analysis is unprecedented.
For instance, Chief Judge Gregory concludes that he must adopt a narrower construction of § 1182(f) than is written to save it from a serious risk of invalidation because of its "breathtaking delegation to the President of virtually unconstrained power." Ante at 291. He thus limits the scope of § 1182(f) to authorize only the exclusion of "(1) foreign nationals whose individual conduct or affiliation makes their entry harmful to national interests *371 for reasons unanticipated by Congress and (2) foreign nationals in response to a foreign-affairs or national-security exigency." Ante at 296; see also ante at 299-300. Without his created limitations, as he asserts, § 1182(f) would have the unconstitutional effect of allowing the President "to dramatically reorganize the domestic affairs of broad swathes of Americans." Ante at 291. And while he recognizes that Congress itself has such power, he does not accept that Congress could intend to give the President the authority that it did in § 1182(f) or that the President shares in that power through Article II of the Constitution. But see Knauff , 338 U.S. at 542, 70 S.Ct. 309 ("The exclusion of aliens is a fundamental act of sovereignty" that "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation") (emphasis added); Fiallo , 430 U.S. at 792, 97 S.Ct. 1473 ("[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the government's political departments largely immune from judicial control") (emphasis added).
Chief Judge Gregory also expands his newfound limitation-that § 1182(f) only authorizes the President to restrict entry of aliens by nationality in response to an exigency-adding that the exigency must be "demonstrated " by the President. Ante at 299-300 (emphasis added). Then, second-guessing the President's explanations based on national security risks, as stated in the Proclamation, he concludes that there was "no apparent exigency justifying immediate, categorical exclusion of foreign nationals ... because [the Proclamation] does not identify any new event or factual circumstance that Congress has not already considered via legislation." Ante at 300. In effect, Chief Judge Gregory rejects the Proclamation's stated reasons for imposing entry restrictions, concluding that the President did not comply with § 1182(f), not because the President did not make findings or give reasons, but because Judge Gregory does not share in the President's view of what findings or reasons justified imposing restrictions on alien entry. Nothing in § 1182(f), however, supports this second-guessing of the President's foreign policy determinations.
Judge Keenan similarly reads new requirements and limitations into § 1182(f). Unwilling to give the statutory language its due, she limits § 1182(f) 's authority to exclude "aliens or classes of aliens" to a more restricted authority to exclude aliens based only on the "class members' individual circumstances or actions." Ante at 314 (emphasis added). She rejects, in particular, the broader authority to exclude a class of aliens that might be defined as coming from a particular country where the "country's conditions relating to the criteria of identity-management, information-sharing, and terrorist activity" were inadequate, as was done in the Proclamation. Id . In doing so, she does not recognize that her interpretation precludes even the exclusion of nationals from a country at war with the United States.
Judge Keenan also reads into § 1182(f) the limitation that the "findings" required by that provision cannot include the fact that nationals from a particular country pose a greater risk based on the country's "faulty [security] protocols," reasoning that such a finding would fail to assess the risk of "individuals. " Ante at 316-17. Faced with prior presidential proclamations and executive orders that did indeed exclude nationals as a class, she attempts to distinguish them by noting, for instance, that they were limited to the defined period of the then-pending crisis. See ante at 315-16. But that explanation does not address the exclusion by previous Presidents of nationals , not individuals based on their individual circumstances.
*372 Judge Wynn's reconstruction of § 1182(f) has even wider implications and is yet less relevant to the issues before us. He concludes that the Proclamation violates § 1182(f) because it is "driven by anti-Muslim bias," ante at 322 (internal quotation marks omitted), and because Congress never authorized such "invidious discrimination" in § 1182(f), ante at 334-35. While it is surely correct that Congress did not authorize "invidious discrimination" in conferring authority on the President in § 1182(f), it did authorize him to "suspend the entry of all aliens or any class of aliens ... or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Judge Wynn's argument is not a statutory one but a straw man that he created based on language not in the statute ; he finds that the Proclamation violates a requirement that is nowhere to be found in § 1182(f). It appears that he is attempting, through § 1182(f), to create constitutionally based rights in aliens excludable under § 1182(f) -to be free from "invidious discrimination"-when they never heretofore had such rights. But because § 1182(f) does not address "invidious discrimination," any claim based on such discrimination must be located elsewhere, not in § 1182(f).
In sum, the district court, Chief Judge Gregory, Judge Keenan, and Judge Wynn disagree with Congress's delegation of authority to the President; they disagree with the Proclamation's exercise of such authority; they find more palatable their "narrower construction" to yield a more limited delegation; and, to give effect to their preferred construction and ultimately their preferred result, they rewrite the statute to insert limitations. Doing that is not a legitimate judicial role.
IV. Establishment Clause Claim
In pursuing their freestanding Establishment Clause claim before the district court, the plaintiffs relied on this court's prior decision enjoining enforcement of Executive Order 13,780 -even though that decision was vacated by the Supreme Court-to assert that "the Proclamation is an attempt to implement the [President's] promised Muslim ban." They urged the district court to "look behind" the Proclamation, which is concededly neutral on its face, and to rely on the same statements of candidate Trump that provided the basis for the majority's earlier decision. The district court ruled as the plaintiffs urged, and the plaintiffs now contend that the district court correctly found that the purpose of the Proclamation is to express anti-Muslim animus and it thus violates the Establishment Clause, which "command[s] ... that one religious denomination cannot be officially preferred over another." Opening Brief at 53 (quoting Larson v. Valente , 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ).
As explained above, the district court isolated the phrase "bona fide" from the Mandel standard and thereby permitted the plaintiffs, who could not refute that the Proclamation was on its face legitimate and bona fide, to present external evidence in an effort to impeach it. The district court summarized its view of the standard by stating that the plaintiffs need only make a particularized showing from external evidence of bad faith, regardless of what the Proclamation provides. Applying that standard, the district court concluded that the plaintiffs, by relying on the President's campaign-trail statements and other similar evidence, plausibly alleged that the Proclamation's stated reason was "not bona fide." The court then proceeded to apply what it deemed to be traditional Establishment Clause jurisprudence, emphasizing that "purpose matters" when assessing the validity of government action *373 under the Establishment Clause (quoting McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky. , 545 U.S. 844, 866 n.14, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) ), and concluding that the "primary purpose" of the Proclamation was "to impose a Muslim ban." On this basis it held that the plaintiffs were likely to succeed on their Establishment Clause claim.
The district court's extraordinary analysis, which the majority fully adopts, suffers from at least three serious errors. First , as already explained, it misconstrued and misapplied the holding of Mandel to look behind the text of the Proclamation; second , in looking behind the text, it created and applied a new and unprecedented rule embracing a scope of relevant evidence that is both dangerous and unworkable; and third , its Establishment Clause analysis stretched the Supreme Court's holdings in this area far beyond their intended scope.
As to the first serious error, Mandel provides only a narrow slot of reviewability for immigration decisions regarding the exclusion of aliens abroad. But even as the Court recognized that the Mandel plaintiffs had presented a legitimate First Amendment claim, it concluded that the claim was unreviewable because the government's stated reason for excluding Mandel was valid on its face. 408 U.S. at 770, 92 S.Ct. 2576. It thus pronounced the rule that governs here:
We hold that when the Executive exercises [congressionally delegated power to exclude aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.
Id . (emphasis added). The Court's reasoning was thus based on a facial assessment of the reasons given by the government and the conclusion that those reasons were facially legitimate and bona fide. Of importance to this case, the Mandel Court did not "look behind" the facial reason based on what the plaintiffs alleged. Id .
The only reason that the district court gave in this case for looking behind the Proclamation was the external evidence presented by the plaintiffs. Rather than first assessing the face of the Proclamation to determine whether its reasons were facially legitimate and bona fide, the district court bypassed that assessment to consider external evidence at the outset. In short, it stood the Mandel standard on its head.
Moreover, the district court never explained why the Proclamation's stated reasons of national security, based on the investigation of some 200 countries by executive agencies, were not legitimate and bona fide. None of the facts or conditions recited as reasons for the issuance of the Proclamation have been challenged as untrue or illegitimate. It is thus readily apparent that, without looking behind the Proclamation, there is simply no basis to argue or conclude that it had anything to do with religion.
The second serious error committed by the district court is just as plain. In "look[ing] behind" the Proclamation to campaign statements and other similar statements, the district court applied a new and totally unprecedented rule of evidence that is fraught with danger and impracticality.
Apart from violating established rules for interpreting unambiguous legal texts-whether statutes, regulations, executive orders, proclamations, or, indeed, contracts-reliance on campaign statements and similar evidence to impose a new *374 meaning on unambiguous language is completely strange to judicial analysis. In the Establishment Clause context, moreover, the Supreme Court has warned against "judicial psychoanalysis of a drafter's heart of hearts." McCreary , 545 U.S at 862, 125 S.Ct. 2722. And consistent with that warning, the Court has never, "in evaluating the legality of executive action, deferred to comments made by such officials to the media." Hamdan v. Rumsfeld , 548 U.S. 557, 623-24 n.52, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The Court's reluctance to consider statements made in the course of campaigning derives from good sense and a recognition of the pitfalls that would accompany such an inquiry.
Because of their nature, campaign statements and other similar statements, including tweets, are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often susceptible to multiple interpretations, depending on the outlook of the recipient. A court applying this new rule would thus have free reign to select whichever expression of an official's developing ideas best supports its desired conclusion.
Moreover, opening the door to the use of campaign-trail statements and similar musings or tweets to inform the text of later executive orders has no rational limit. If a court, dredging through the myriad remarks of an officeholder, fails to find material to produce the desired outcome, what stops it from probing deeper to find statements from a previous campaign, or from a previous business conference, or from college?
And how would use of such statements take into account intervening acts, events, and influences? When a candidate wins the election to the presidency, he takes an oath of office to abide by the Constitution and the laws of the Nation. And he appoints officers of the government and retains advisors, usually specialized in their field. Is there not the possibility that a candidate might have different intentions than a President in office? And after taking office, a President faces external events that may prompt new approaches altogether. How would a court assess the effect of these intervening events on presidential intent without conducting "judicial psychoanalysis"?
At bottom, the danger of this new rule is that it will enable a court to justify its decision to strike down any executive action with which it disagrees. It need only find one statement that contradicts the official reasons given for a subsequent executive action and thereby pronounce that the official reasons were a pretext.
Moreover, the unbounded nature of the new rule will leave the President and his administration in an untenable position for future action. It is undeniable that President Trump will continue to need to engage in foreign policy regarding majority-Muslim nations, including those designated in the Proclamation. Yet, the district court's opinion presupposes that the Proclamation is tainted by prior campaign-trail statements and prior executive orders, clearly indicating that future actions might also be subject to the same challenges made today.
Finally, the new rule would by itself chill political speech directed at voters seeking to make their election decision. It is hard to imagine a greater or more direct burden on campaign speech than the knowledge that any statement made might be used later to support the inference of some nefarious intent when official actions are inevitably subjected to legal challenges.
*375 As its third serious error, the district court held, on the merits, that the plaintiffs were likely to show that the Proclamation violates the Establishment Clause's requirement of religious neutrality because it was issued primarily for the President's subjective purpose of targeting Muslims. To be sure, when legitimately applying Establishment Clause jurisprudence, courts consider whether government action is indeed motivated by a secular, rather than a religious, purpose. See Lemon v. Kurtzman , 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). And while the government's "stated reasons" for an action "will generally get deference," it is also true that "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." McCreary , 545 U.S. at 864, 125 S.Ct. 2722. "The eyes that look to purpose," moreover, "belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." Id. at 862, 125 S.Ct. 2722 (quoting Santa Fe Indep. Sch. Dist. v. Doe , 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) ).
But these generic standards are all the doctrinal support that the plaintiffs have mustered. Apart from the fact that the Supreme Court has never applied the Establishment Clause to matters of national security, foreign affairs, and immigration, in particular, it has invalidated only a few government actions based on a religious purpose, McCreary , 545 U.S. at 859, 125 S.Ct. 2722 (remarking that the Court had "found government action motivated by an illegitimate purpose only four times since Lemon "), and each is manifestly distinguishable from the Proclamation in this case.
First, for all of the weight that the plaintiffs, the district court, and the majority place on McCreary , they ignore that the McCreary Court confronted a facially religious government action-the display of the Ten Commandments in two county courthouses. The McCreary Court thus began with a presumption that the display was intended to promote religion. See 545 U.S. at 867-69, 125 S.Ct. 2722. When it examined the legislative history surrounding the displays, it did so only to reject the government's attempt to overcome that presumption with a secular, pedagogical purpose-a purpose that the Court declined to accept because it was adopted "only as a litigating position," id . at 871, 125 S.Ct. 2722, "without a new resolution or repeal of the old [and expressly religious] one," id. at 870, 125 S.Ct. 2722 ; see also Sch. Dist. of Abington Twp. v. Schempp , 374 U.S. 203, 223-24, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (holding that schools' policy of required Bible study and recitation of the Lord's Prayer violated the Establishment Clause).
In stark contrast, the district court here recognized that nothing on the face of the Proclamation speaks to religion. Under McCreary , therefore, it should have begun with the presumption that the Proclamation was neutral toward religion. In this circumstance, contrary extrinsic statements made prior to the Proclamation's issuance surely do not supplant its facially legitimate national security purpose. See McCreary , 545 U.S. at 865, 125 S.Ct. 2722 ("[T]he Court often ... accept[s] governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims"); Mueller v. Allen , 463 U.S. 388, 394-95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (referring to the Court's "reluctance to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"). Indeed, to hold otherwise would fly in the face of the *376 Court's decisions upholding government actions with connections to religion far more obvious than those here. See Lynch v. Donnelly , 465 U.S. 668, 681, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (city's inclusion of crèche in Christmas display justified by "legitimate secular purposes," namely "to celebrate the Holiday and to depict the origins of that Holiday"); McGowan v. Maryland , 366 U.S. 420, 444-49, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (upholding State's requirement that businesses be closed on Sundays because, while Sunday laws had obvious religious origins, their religious purpose had dissipated in favor of a secular one).
Nonetheless, the district court engaged in a review of the national security justifications given in the Proclamation and concluded that they were essentially a pretext or, at most, reflected a purpose secondary to the unstated objective of expressing anti-Muslim animus. This analysis, again, flies in the face of Mandel , Fiallo , and Din . Moreover, even within traditional Establishment Clause jurisprudence, it is an unprecedented overreach. It goes far beyond the Court's inquiry in McCreary , where the government offered a secular "litigating position" for a facially religious action, 545 U.S. at 871, 125 S.Ct. 2722, or in Wallace v. Jaffree , where the government's proffered secular purpose for a statute that provided for "meditation or voluntary prayer" was belied by the fact that a previous law already provided for a minute of meditation, 472 U.S. 38, 58-61, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (finding that the bill's "sole purpose" was religious). In those cases, the Court accepted the soundness of the proffered secular purposes but concluded that undisputed historical facts made clear that the secular purpose was neither primary nor plausible. Critically, however, the Court did not question the factual bases underlying the government's proffered secular purpose for a facially neutral action.
Moreover, the district court's lack of deference is particularly inappropriate where the government's secular purpose is related to national security-a subject, as the majority recognizes, on which we owe the Executive significant deference. See Humanitarian Law Project , 561 U.S. at 33-34, 130 S.Ct. 2705 (explaining that, where the Executive had concluded that material support to terrorist organizations "will ultimately inure to the benefit of their criminal, terrorist functions," "[t]hat evaluation of the facts by the Executive ... is entitled to deference" because it "implicates sensitive and weighty interests of national security and foreign affairs"); Mandel , 408 U.S. at 765-66, 92 S.Ct. 2576.
Unless corrected, the district court's approach will become a sword for plaintiffs to challenge any facially neutral government action, particularly an action affecting regions dominated by a single religion. Government officials will avoid speaking about religion, even privately, lest a court discover statements that could be used to ascribe a religious motivation to their future actions. And, in the more immediate future, courts will be faced with the unworkable task of determining when this President's supposed religious motive has sufficiently dissipated so as to allow executive action toward the countries subject to the Proclamation or other majority-Muslim countries. The Establishment Clause demands none of these unfortunate and unprecedented results.
V
The public debate over the Administration's foreign policy and, in particular, its immigration policy, is indeed intense and thereby seductively tempts courts to effect a politically preferred result when confronted with such issues. But public respect *377 for Article III courts calls for heightened discipline and sharpened focus on only the applicable legal principles to avoid substituting judicial judgment for that of elected representatives. It appears that the temptation may have blinded some Article III courts, including the district court and perhaps the majority of this court, to these obligations, risking erosion of the public's trust and respect, as well as our long-established constitutional structure.
In this context and for the results demanded by applicable law, I would reverse the district court and vacate its preliminary injunction.

Notably, Kaloudis found a basis for this clear outer limit on congressional delegations of discretionary authority to the executive branch in the Immigration Act well before Congress made explicit, in comprehensively amending the Immigration Act, that discrimination on the basis of race, sex, ethnicity, and nationality has no place in controlling immigration. See infra Part I.C.3.

Indeed, under Judge Niemeyer's evidentiary rule-which would bar consideration of any facts outside of the four corners of a presidential proclamation-courts could not consider statements made by the President made while signing the Proclamation .

Courts routinely rely on an actor's contemporaneous statements as to his intent in numerous other legal contexts as well. See, e.g. , S. Dakota Farm Bureau, Inc. v. Hazeltine , 340 F.3d 583, 594 (8th Cir. 2003) (relying on notes of statutory drafting meeting to conclude that statute was enacted to discriminate against out-of-state economic interests and therefore violated the dormant Commerce Clause); E.E.O.C. v. Town & Country Toyota, Inc. , 7 Fed.Appx. 226, 232-33 (4th Cir. 2001) (relying on defendant's contemporaneous statements in Americans with Disabilities Act case to ascertain governmental defendant's intent in firing plaintiff); Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co. , 505 F.2d 989, 1019 (2d Cir. 1974) (relying on contemporaneous statements by airplane hijackers to determine their intent in insurance coverage case).

Judge Niemeyer's separate opinion maintains that in considering these undisputed facts, the majority opinion impermissibly "look[s] behind" the face of the Proclamation. Post at 373. But consideration of these undisputed facts does not require "look[ing] behind" anything. The President made his statements bearing on his intent to ban Muslims, reflecting his anti-Muslim animus, and expressing disagreement with the policy rationales relied on by the Government on Twitter and in press statements . See, e.g. , J.A. 135, 1497-99, 1502-03, 1508. Accordingly, the President sought to and did put his views and policy goals "out front" by disseminating them to millions, if not billions, of people. By contrast, Mandel -the case relied on by the separate opinion to justify its proposed evidentiary rule barring consideration of facts outside the four corners of the Proclamation-involved letters between the Department of State and the Immigration and Naturalization Service and attorneys for the alien denied entry. 408 U.S. at 759, 92 S.Ct. 2576.

Our country adheres to the rule of law in preserving core constitutional protections. Thus, when the President can identify no change in circumstances justifying an invidious encroachment on constitutional rights, a simple claim of potential harm to national security does not provide the President with unfettered authority to override core constitutional protections. See New York Times Co. v. United States , 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (holding that a claim of potential harm to national security does not provide the executive branch with unconstrained authority to override the freedom of the press). Indeed, even the invocation of Congressional war powers to protect national defense do "not remove constitutional limitations safeguarding essential liberties." Robel , 389 U.S. at 264-67, 88 S.Ct. 419 (internal quotation marks omitted).

I have removed all internal alterations, citations, and quotation marks here and throughout unless otherwise noted.

For purposes of discussion, I assume that the "prolonged separation" claim is an injury sufficient to confer standing under the INA, as the district court held. See IRAP , 265 F.Supp.3d at 595-96.

Unlike its consideration of the INA claims, the district court did not analyze the organizational plaintiffs' Establishment Clause standing in their own right.

There are a number of exceptions to this description of the individual plaintiffs, but they are not material to the ensuing analysis. One of the plaintiffs, Mohammed Meteab, does not claim to have a relative who is a national of one of the eight countries identified by the Proclamation. Several plaintiffs have relatives who are nationals of one of the eight countries but who obtained a U.S. visa during the pendency of this case, or during the litigation concerning the preceding executive orders. At least two plaintiffs have relatives who, after so obtaining a visa, have now entered the United States. And one or more plaintiffs have relatives who have been denied visas and deemed ineligible for waivers pursuant to the Proclamation.

It is noteworthy that in a case challenging DHS's plan to rescind the immigration program known as Deferred Action for Childhood Arrivals ("DACA"), the Supreme Court recently granted the government relief from the district court's order to complete the administrative record, instructing the Ninth Circuit and the lower court to address first the threshold questions of whether the "determination to rescind DACA is unreviewable because it is 'committed to agency discretion,' 5 U.S.C. § 701(a)(2), and [whether] the Immigration and Nationality Act deprives the District Court of jurisdiction." In re United States , --- U.S. ----, 138 S.Ct. 443, 445, 199 L.Ed.2d 351 (2017).